OAK ROAD FAMILY DENTISTRY,
P.C., and Dr. Kenneth McMillan,
Plaintiffs,

v.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,
Defendant.

No. 1:03 CV 3633 WSD.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 3, 2005.

The plaintiffs were represented by Michael Weinstock and Matthew Carlton of Weinstock & Scavo, P.C., of Atlanta.

The defendant was represented by H. Sanders Carter, Jr., and Stacia L. Guthrie of Carter & Ansley LLP of Atlanta.

## ORDER

DUFFEY, District Judge.

This matter is before the Court on Defendant Provident Life and Accident Insurance Company's Motion for Summary Judgment [9] and Plaintiffs Oak Road Family Dentistry, P.C. and Dr. Kenneth McMillan's Cross Motion for Summary Judgment [15].

## I. BACKGROUND

### A. Factual Background

Plaintiff Dr. Kenneth McMillan ("Dr. McMillan") is a dentist formerly associated with Plaintiff Oak Road Family Dentistry, P.C. ("Oak Road").[1] Effective March 1, 1984, Defendant Provident Life and Accident Insurance Company ("Provident") is-

sued to Oak Road a business buy-out expense insurance policy (the "Policy"). The Policy is designed to provide funds toward the purchase of Dr. McMillan's ownership interest in Oak Road in the event he becomes totally disabled. (*See* Policy at 4.)

The Policy provides that if Dr. McMillan becomes totally disabled while he is engaged in "active full-time work" for Oak Road, and his ownership interest is purchased by or through Oak Road pursuant to a "Buy–Sell Agreement," Provident will reimburse Oak Road for buy-out payments of up to $2500 per month, subject to a maximum reimbursement of $100,000. (Policy at 3–5.) The Policy includes the following definitions:

- "Total Disability means that as a result of Injuries or Sickness [Dr. McMillan]: (1) Is unable to perform the duties of [his] occupation; and (2) Is under the care and attendance of a physician." (*Id.* at 4);

- "Active full-time work means spending at least 1500 hours per year performing [Dr. McMillan's] occupation duties for [Oak Road]." (*Id.*); and

- "The Buy–Sell Agreement means a written agreement between [Oak Road] and/or its Principals and [Dr. McMillan]. It must provide for the purchase of [Dr. McMillan's] ownership interest in [Oak Road] as a result of his/her Total Disability." (*Id.*)

The "Explanation of Benefits" provision of the Policy explains further the purpose of the Policy, its requirements and the manner in which benefits are paid. This section provides in pertinent part:

---

1. Oak Road is the current name of the entity with which Dr. McMillan was associated. The entity previously was named "Drs. Bentley & McMillan, P.C.," as well as "Drs. Bentley, McMillan & Hibbard, P.C." The parties do not dispute that Oak Road is the same legal entity. To avoid confusion, the Court shall refer to this entity as "Oak Road" throughout the relevant time period, even if it was known at that time by some other name.

- "This policy provides funds toward purchasing [Dr. McMillan's] ownership interest in [Oak Road] because of [his] Total Disability." (*Id.* at OC–2.);

- "After [Dr. McMillan's] Total Disability has continued through the Elimination Period shown in the Schedule we will reimburse [Oak Road] for the amounts of Business Buy–Out Expense which thereafter accrue and are paid under the terms of the Buy–Sell Agreement to the totally disabled [Dr. McMillan]."[2] (*Id.*);

- "For benefits to be paid, [Dr. McMillan] must be engaged in active full-time work for [Oak Road] when he becomes disabled." (*Id.*); and

- "The Buy–Sell Agreement is a written agreement between [Dr. McMillan] and [Oak Road] and/or its Principals. It sets forth the terms for the purchase of [Dr. McMillan's] ownership interest in [Oak Road] because of his Total Disability. Business Buy–Out Expense means any money paid by or through [Oak Road] to [Dr. McMillan] in fulfillment of the terms of the Buy–Sell Agreement." (*Id.*).

The Policy provides for payment of benefits to Oak Road, not to Dr. McMillan directly. (*Id.* at 5 ("All benefits of this policy will be paid to the Loss Payee").)

Dr. McMillan began practicing with Oak Road in 1974, and became a 50% shareholder in 1978. The other 50% shareholder was Dr. Billy Carl Bentley. From 1974 though February 1990, Dr. McMillan practiced dentistry with Oak Road on a full-time basis, working from 7:00 a.m. to 5:00 p.m. five days per week. In February 1990, Dr. McMillan suffered a heart attack and was diagnosed with coronary artery disease. On the advice of his doctor, Dr. McMillan reduced the level of his work and the number of hours he worked. For the ten (10) year period from February 1990 through October 2000, Dr. McMillan worked only approximately 14 to 22 hours per week.

In 1996 or 1997, Dr. Laurence Hibbard became employed by Oak Road. Effective July 31, 1998, Dr. Bentley resigned from Oak Road. Dr. McMillan subsequently purchased Dr. Bentley's 50% ownership interest and became the 100% owner of Oak Road.

In late March and early April 1999, Dr. McMillan entered into three agreements relevant to the instant action: (1) the Stock Purchase Agreement with Dr. Hibbard whereby Dr. Hibbard purchased 50% of the shares in Oak Road from Dr. McMillan for $107,600[3] ("First Stock Purchase Agreement") (First Stock Purchase Agreement, attached to McMillan Dep. as Exhibit 3); (2) the Shareholders Agreement with Dr. Hibbard whereby Dr. McMillan and Dr. Hibbard each agreed to purchase the other's shares in Oak Road in the event of the other's death, withdrawal, retirement or disability (Shareholders Agreement, attached to McMillan Dep. as Exhibit 6, § 20.2); and (3) the Employment Agreement with Oak Road under which Dr. McMillan was to receive an annual income of $34,000 for "management

---

2. The Elimination Period under the Policy is twelve (12) months.

3. Dr. Hibbard agreed to pay $15,000 of the purchase price at the closing of the contract, and to pay the balance with interest in 120 equal consecutive monthly installments of $1,173.04.

duties"[4] (Employment Agreement, attached to McMillan Dep. as Exhibit 8, § 7.2).

On September 1, 2000, Dr. McMillan and Oak Road entered into a Consulting Agreement. (Consulting Agreement, attached to McMillan Dep. as Exhibit 18.) This agreement required Dr. McMillan to perform certain services for Oak Road:

- *"Employment.* Dr. McMillan accepts employment for the periods and at the salaries set forth in this Agreement." (Consulting Agreement § 5.1);

- *"Employment Duties.* During the period of active employment before his retirement, Dr. McMillan shall faithfully perform his duties to the best of his ability, and in accordance with the directions of [Oak Road's] Board of Directors. Those duties shall be as set forth in his separate Employment Agreement with [Oak Road], and substantially the same as those he previously performed. He shall devote his whole time and attention to the performance of his duties, and shall not become associated with, engage in, or render services to any other dental practice." (*Id.* at § 5.2);

- *"Consultation Services.* During the period of fifteen (15) years after his retirement, Dr. McMillan shall perform all advisory and consultative services set forth in [section] 4.2 and such other services that [Oak Road] may reasonably request, in order that [Oak Road] may continue to benefit from Dr. McMillan's experience, knowledge, reputation, and contacts in the industry, his exceptional manage-

ment skills and business methods and acumen. Dr. McMillan shall be available to advise and counsel [Oak Road's] officers at all reasonably times by telephone, mail, or in person. However, Dr. McMillan's failure to render such services, or to give such advice and counsel due to illness of incapacity shall not affect his right to receive compensation during that period." (*Id.* at § 5.3); and

- *"Failure to Perform.* If Dr. McMillan shall fail to substantially perform all the terms and conditions of this Agreement, or if he voluntarily leaves active employment prior to his retirement, or if during such period of active employment prior to his retirement he is discharged for proper cause, he shall forfeit his rights to all subsequent compensation that [Oak Road] is required to pay to him or to others." (*Id.* at § 5.4).

The Consulting Agreement provided that from the date of Dr. McMillan's retirement until the date on which benefit payments under the Policy commenced, Dr. McMillan would receive a consulting fee of $3100 per month. (*Id.* at § 4.2.) When and if benefit payments under the Policy were made to Oak Road, Dr. McMillan's consulting fee was to increase to $9766 per month, and over the course of the pay-out period was to return to $3100 per month. (*Id.*) It also provided that payments were not required to be made under the Consulting Agreement "unless Dr. McMillan performs all of the required terms and conditions of this Agreement." (*Id.*) The Consulting Agreement also contained an integration clause that states: "This Agreement supercedes all other agree-

---

**4.** In the event Dr. McMillan became disabled or otherwise terminated his employment with Oak Road, this income was to continue until October 1, 1999, as "deferred compensation."

ments previously made between the parties relating to its subject matter. There are no other understandings or agreements." (*Id.* at § 10.)

In late October 2000, Dr. McMillan's treating physician advised him that due to the deterioration of his health, he could no longer practice dentistry, even on a part-time basis, and Dr. McMillan ceased practicing shortly thereafter. Accordingly, effective December 31, 2000, Dr. McMillan resigned as an officer and director of Oak Road. As part of his resignation, Dr. McMillan entered into a Termination Agreement which expressly stated that "the Shareholders' Agreement, the Severance Benefit Agreement, and [Dr. McMillan's] Employment Agreement are terminated, void, and of no further effect, as of [December 31, 2000]." (Termination Agreement, attached to Pl. Dep. as Exhibit 19.)

On January 1, 2001, Dr. McMillan entered into a second Stock Purchase Agreement with Dr. Hibbard ("Second Stock Purchase Agreement"). Pursuant to the terms of this Agreement, Dr. Hibbard purchased Dr. McMillan's remaining 500 shares in Oak Road for $95,000. Dr. Hibbard paid for the stock with a check drawn on his personal account, and Oak Road has not reimbursed him for this $95,000 payment.

Since 2001, Dr. McMillan has received two checks each month. The first check is from Dr. Hibbard in the amount of $1,173 and represents the ongoing installment payment under the First Stock Purchase Agreement for Dr. Hibbard's purchase of the first 50% of Dr. McMillan's stock. The

second check is from Oak Road in the amount of $3,100 and represents the consulting fee paid under the Consulting Agreement.

Commensurate with his full retirement from the practice of dentistry, Dr. McMillan notified Provident of his claim for disability in late November 2000, and submitted his claim in December 2000. Provident denied his claim in February 2001.

### B. Procedural History

In November 2002, Oak Road assigned to Dr. McMillan its right to assert a cause of action for benefits under the Policy. Dr. McMillan and Oak Road filed this case in the State Court of Fulton County, Georgia on October 21, 2003, asserting claims for breach of contract, bad-faith refusal to pay insurance benefits under O.C.G.A. § 33–4–6, and bad-faith litigation under O.C.G.A. § 13–6–11.[5] (Verified Compl., attached to Notice of Removal [1] as Exhibit A, ¶¶ 46–53, 54–57, 58–60.) Provident removed the case to this Court on November 26, 2003, on the basis of diversity jurisdiction. (Notice of Removal at 2–3.) Discovery ended on May 1, 2004, and Provident filed its Motion for Summary Judgment and Memorandum in Support ("Def.'s Mot. for Summ. J.") [9] on May 21, 2004. On June 14, 2004, Plaintiffs filed their response to Provident's motion ("Pls.' Resp. to Def.'s Mot. for Summ. J.") [14], as well as their Cross Motion for Summary Judgment and Brief in Support ("Pls.' Mot. for Summ. J.") [15]. Provident filed its Unified Reply Memorandum in Support of Its Motion for Summary Judgment and Re-

---

**5.** This is the second lawsuit concerning the Policy. The first lawsuit was filed by Dr. McMillan in January 2002 in the State Court of Fulton County, Georgia, and was voluntari-ly dismissed without prejudice by Dr. McMillan in August 2003. Oak Road was not a party to the first lawsuit.

sponse to Plaintiffs' Cross Motion for Summary Judgment ("Def.'s Reply and Resp. to Pls.' Mot. for Summ. J.") [23] on July 14, 2004. Plaintiffs filed their reply brief in support of their Cross Motion for Summary Judgment on August 16, 2004 ("Pls.' Reply in Support of Their Mot. for Summ. J.") [26].

## II. DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir.1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. *Graham v. State Farm Mut., Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir.1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." *Id.* at 1282.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. *United of Omaha Life Ins. Co. v. Sun Life Ins.*

Co. of Am., 894 F.2d 1555, 1558 (11th Cir.1990). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." *Graham*, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In this case, both parties have moved for summary judgment. The Court views the evidence in the light most favorable to Plaintiffs in deciding Provident's Motion for Summary Judgment, and in the light most favorable to Provident in evaluating Plaintiffs' Motion for Summary Judgment.

### A. Provident's Motion for Summary Judgment

Provident argues Plaintiffs are not entitled to benefits under the Policy because Plaintiffs fail to satisfy three requirements of the Policy: (1) Dr. McMillan was not engaged in active full-time work when he became totally disabled in 2000 [6]; (2) Dr. McMillan's ownership interest was not acquired pursuant to the terms of a "Buy–Sell Agreement"; and (3) Dr. McMillan's ownership interest was not purchased "by or through" Oak Road.[7]

#### 1. *Insurance Contracts Generally*

 The interpretation of an insurance policy in a coverage dispute is guided

6. Provident asserts Plaintiffs' claims are barred both because various conditions precedent in the Policy were not satisfied and because Dr. McMillan is not totally disabled within the terms of the Policy. However, for the purposes of its Motion for Summary Judgment only, Provident concedes Dr. McMillan

became totally disabled either in 1990 or in 2000.

7. Apparently unsure of Plaintiffs' position regarding when Dr. McMillan became totally disabled, Provident initially argued a fourth reason for summary judgment; namely, that

by established principles. "The construction of a contract is a question of law for the court. Where any [question] of fact is involved, the jury should [decide] the fact." *Nationwide Mut. Fire Ins. Co. v. Somers*, 264 Ga.App. 421, 591 S.E.2d 430, 433 (2003) (quoting O.C.G.A. § 13–2–1). Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 498 S.E.2d 492, 494 (1998) (citing *Park 'N Go v. U.S. Fid. and Guar. Co.*, 266 Ga. 787, 471 S.E.2d 500 (1996)). "Ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." *Boardman Petroleum, Inc.*, 498 S.E.2d at 494 (quoting *Richards v. Hanover Ins. Co.*, 250 Ga. 613, 299 S.E.2d 561 (1983)). "Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." *Boardman Petroleum, Inc.*, 498 S.E.2d at 494 (citations omitted); *see also Ryan v. State Farm Mut. Auto. Ins. Co.*, 261 Ga. 869, 413 S.E.2d 705 (1992) ("If the terms of the contract are plain and unambiguous, the contract must be enforced as written, so long as it is within the prescribed bounds of the law") (internal citations omitted). "The contract is to be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others." *Boardman Petroleum, Inc.*, 498 S.E.2d at 494. Applying these principles, the Court will address Provident's arguments in favor of summary judgment.

### 2. *Active Full–Time Work*

The Policy provides that "[b]enefits are payable for Total Disability which begins while [Dr. McMillan] is engaged in active full-time work for [Oak Road]." (Policy at 5.) "Active full-time work" is defined by the Policy as "spending at least 1500 hours per year performing [Dr. McMillan's] occupational duties for [Oak Road]." (*Id.* at 4.) Dr. McMillan admits he became totally disabled in October 2000. (Verified Compl. ¶ 47.) Provident argues Dr. McMillan was not engaged in active full-time work under the Policy when he became totally disabled in October 2000, and thus is not entitled to benefits under the Policy. Provident offered evidence that in October 2000 Dr. McMillan was working a maximum of three days a week for six to seven hours per day, which would put him on pace for, at most, approximately 1100 total hours—400 hours short of what the Policy required for full-time work. Provident also submitted evidence that Dr. McMillan himself characterized his work since 1990 as "part-time" in his claim for benefits, and stated that he did not intend to return to full-time status.

if Plaintiffs argued Dr. McMillan became totally disabled in 1990 when he was initially diagnosed with heart disease, then Plaintiffs' claims for benefits under the Policy were barred because Plaintiffs did not provide Provident with notice of the claim until ten years later. In response to this fourth argument, Plaintiffs argue that the illness which caused Dr. McMillan's total disability began in 1990, but that he did not become totally disabled, and the Policy was not triggered, until 2000. (*See* Pl.'s Resp. to Def.'s Mot. for Summ J. at 5–6; *see also* Verified Compl. ¶ 47) ("Payment [under the Policy] was to commence after [Dr. McMillan] became totally disabled, which occurred on October 26, 2000 ....") Thus, it is not necessary for the Court to consider Provident's argument concerning failure to provide timely notice of the claim.

■ Plaintiffs do not challenge Provident's assertion that Dr. McMillan was not engaged in active full-time work in 2000 when he left the practice of dentistry. Instead, Plaintiffs argue Dr. McMillan was engaged in active full-time work in 1990 when he first began to suffer from coronary artery disease, and this fact is sufficient to entitle him to benefits under the Policy. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 4–9.) In essence, Plaintiffs contend that an individual becomes "totally disabled" under the Policy at the time he is diagnosed with an illness which ultimately prevents him from performing the duties of his occupation, even if the illness for many years does not prevent him from performing the duties of his occupation.

This argument contradicts the plain language of the Policy. "Total Disability" under the Policy means "that as a result of Injuries or Sickness [Dr. McMillan: 1. is unable to perform the duties of [his] occupation; and 2. is under the care and attendance of a Physician."] (Policy at 4.) "Benefits are payable for Total Disability which begins while [Dr. McMillan] is engaged in active full-time work for [Oak Road]." Id. at 5; see also id. at OC–2 ("For benefits to be paid, [Dr. McMillan] must be engaged in active full-time work for [Oak Road] when he becomes disabled.".) The Policy clearly provides that the Total Disability—not the illness which might ultimately cause the Total Disability—must begin at a time when the individual is engaged in full-time work. Dr. McMillan was diagnosed with coronary artery disease in 1990. It is undisputed, however, that he was able to and did perform the duties of his occupation, albeit on a limited or part-time basis, until 2000, when his physicians concluded he needed to terminate his medical practice. Accordingly, at the time Plaintiff became totally disabled under the Policy, he was not engaged in active full-time work and benefits under the Policy thus were not payable.

The single case cited by Plaintiffs in support of their position—*Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702 (11th Cir.1995)—is not relevant. In that case, an employee claimed she was entitled to benefits under her employer's plan because of a total disability. The employer denied benefits on the ground the employee was not totally disabled, relying on her physician's recommendation she return to "limited duty" and her attempts to return to work for two days. *Id.* at 706. The court rejected the employer's arguments, holding the employee's unsuccessful attempt to return to work for two days "does not forever bar her collection of sickness disability benefits." *Id.* This decision stands only for the proposition that an employee's unsuccessful attempt to return to work does not preclude a finding of total disability. It is not persuasive authority here, where Dr. McMillan returned to work and remained at work on a part-time basis for ten (10) years. Because no reasonable juror could find Dr. McMillan was engaged in active full-time work when he became totally disabled in October 2000, summary judgment on Plaintiffs' claims for breach of contract and for bad-faith refusal to pay under O.C.G.A. § 33–4–6 is warranted.[8]

### 3. *Pursuant to the Terms of a Buy–Sell Agreement*

Provident's obligation to reimburse Oak Road for buy-out payments also is express-

---

8. Plaintiffs' argument clearly is an attempt to avoid the conundrum presented by Provident's alternate arguments concerning the failure to give notice (if total disability began in 1990) and the failure to engage in active full-time work (if total disability began in 2000). Plaintiff cannot argue both that Dr. McMillan's illness began in 1990 when his coronary artery disease manifested itself, thus satisfying the full-time work requirement, and

ly contingent upon Dr. McMillan's ownership interest having been purchased "in fulfillment of the terms of [a] Buy–Sell Agreement." (Policy at 5.) "Buy–Sell Agreement means a written agreement between the Business and/or its Principals and [Dr. McMillan]. It must provide for the purchase of [Dr. McMillan's] ownership interest in [Oak Road] as a result of [his] Total Disability." (*Id.*) Provident argues that, even if Dr. McMillan was engaged in full-time work when he became totally disabled, it still is entitled to summary judgment because the payments to Dr. McMillan were not made in fulfillment of the terms of a Buy–Sell Agreement. The parties agree the agreement between Dr. McMillan and Oak Road or its principals which provided for the purchase of Dr. McMillan's ownership interest as a result of a Total Disability was the April 1999 Shareholders Agreement between Dr. McMillan and Dr. Hibbard. Provident contends that, because under the plain terms of the Termination Agreement the Shareholders Agreement was terminated on December 31, 2000, any payments made to Dr. McMillan after December 31, 2000, could not have been "in fulfillment" of the Shareholders Agreement and therefore are not covered under the Policy.[9]

■ Plaintiffs argue the payments to Dr. McMillan were made pursuant to two Buy–Sell Agreements: the Shareholders Agreement and the Consulting Agreement. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 11–12; Pls.' Reply in Support of Their

Mot. for Summ. J. at 6.) With respect to Provident's argument that the Shareholder's Agreement terminated on December 31, 2000, and that the payments made to Dr. McMillan therefore were not made "in fulfillment" of the Shareholder's Agreement, Plaintiffs summarily assert "[t]here is no credibility to this argument." (Pls.' Reply in Support of Their Mot. for Summ. J. at 6.) Plaintiffs argue, without elaboration, that "[t]he reason the Shareholder's Agreement was terminated on December 31, 2000 is because, prior to that date, Dr. McMillan was deemed medically required to retire as a result of his disease and, therefore, Dr. McMillan sold his ownership interest in the practice, in accordance with the [Shareholder's] Agreement, making him no longer a Shareholder in same." (*Id.*) Although their argument is not clearly articulated, Plaintiff appears to contend the Shareholders Agreement was terminated because Dr. McMillan's ownership interest already had been purchased, thus fulfilling the Agreement.

This argument is without merit. It is undisputed Dr. McMillan's remaining ownership interest was not purchased until January 1, 2001, pursuant to the terms of the Second Stock Purchase Agreement with Dr. Hibbard. The Shareholders Agreement terminated prior to this purchase, and the payment made by Dr. Hibbard was in fulfillment of the Second Stock Purchase Agreement, not the Shareholders Agreement. Plaintiffs simply have no factual or legal basis to rely on the Share-

---

that he was not totally disabled until he retired in 2000, thus satisfying the timely notice requirement. For the reasons discussed above, such an argument is untenable under the plain terms of the Policy and therefore is rejected.

9. Dr. McMillan testified at his deposition that the Termination Agreement terminated the

Shareholder's Agreement effective December 31, 2000. (Pl. Dep. at 101, Ex. 19.) Plaintiffs argue in their brief that payments to Dr. McMillan were made pursuant to the Shareholder's Agreement but provide no record evidence to dispute Dr. McMillan's deposition testimony.

holders Agreement in arguing the payments to Dr. McMillan were made in fulfillment of a Buy–Sell Agreement. The undisputed evidence demonstrates the Shareholders Agreement no longer existed when Dr. McMillan began receiving payments for his ownership interest in Oak Road.

Plaintiffs next argue the Consulting Agreement also constituted a Buy–Sell Agreement. The Consulting Agreement, by its plain and unambiguous terms, does not provide for the purchase of Dr. McMillan's ownership interest as a result of his becoming totally disabled. It expressly provides for payment of a consulting fee in exchange for Dr. McMillan performing for Oak Road "advisory and consultative services" regarding "transferability of patients, practice management, ongoing market advice, identification of merger and acquisition candidates, acquisition of associate dentists, hygiene staff, dental assistants, front office personnel, and basically all other things necessary to the implementation and maintenance of appropriate business policies on behalf of and for [Oak Road]." (Consulting Agreement §§ 4.2, 5.3.) Term after term of the Consulting Agreement provides for payments to Dr. McMillan as compensation for consulting services he was required to and which he agreed to perform. The Agreement does not refer to Dr. McMillan's ownership interest in Oak Road or provide for purchase of that interest as a result of his becoming totally disabled. Thus, it does not comply with the specific, unambiguous requirements for a Buy–Sell Agreement under the Policy.

Plaintiffs argue that, notwithstanding its plain and unambiguous terms, the Consulting Agreement was intended to compensate Dr. McMillan for his ownership interest in Oak Road. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 12–14.) In support of this argument, Plaintiffs rely on evidence that (1) the consulting fees will be paid to Dr. McMillan even if he dies or becomes totally disabled; and (2) the consulting arrangement was intended, at least at one time, to compensate Dr. McMillan for his ownership interest in Oak Road.[10] (Id.) Plaintiff's reliance on this evidence is misplaced.

The continuation of the consulting fees is not relevant. To constitute business buy-out expenses covered by the Policy, payments to Dr. McMillan must be made in fulfillment of an agreement which provides for the purchase of his ownership interest as a result of his becoming totally disabled. (Policy at 5.) Payment of the consulting fees was to commence on the effective date of Dr. McMillan's retirement, regardless of whether his retirement was precipitated by a total disability under

10. Plaintiffs rely on an October 30, 2000 letter memorandum provided to Dr. McMillan by Cain, Watters & Associates, P.C., an accounting firm. (Cain & Watters Memorandum, attached to Pls.' Mot. for Summ. J. as Exhibit G.) The memorandum is entitled "Key Points of Consideration for the Practice Transition of [Oak Road]." It sets out Cain & Watters' valuation of Dr. McMillan's 50% ownership interest and proposes financing the purchase of this interest using a combination of a cash payment from Dr. Hibbard, a long-term consulting fee arrangement between Dr. McMillan and Oak Road, and the proceeds from two business buy-out policies (including the Policy issued by Provident). (Id. at 1–3; Pls.' Resp. to Def.'s Mot. for Summ. J. at 10.) The memorandum acknowledges that classifying part of the financing as consulting fees is "an aggressive approach in the allocation of the purchase price," but states that allocating a larger amount to the value of Dr. McMillan's stock "doesn't make economic sense," presumably because it will incur more tax liability for Dr. McMillan than the proposed arrangement. (Id. at 5.)

the Policy. (Consulting Agreement § 4.2.) That the consulting fees will continue as "deferred compensation" *in spite of* Dr. McMillan's death or total disability, (*id.* at § 4.3), does not render them payments made *as a result of* his total disability, nor does it render them payments made for ownership interest. In fact, the payments were not even timed to start after the expiration of the Elimination Period or to track payments that accrued after the Elimination Period ended, as provided for in the Policy.

Plaintiffs' evidence that the consulting fees were intended as compensation for Dr. McMillan's ownership interest also does not alter the result here. The Policy covers only payments made pursuant to an agreement which "provides" for the purchase of Dr. McMillan's ownership interest. (Policy at 4.) "Provides" means "to make a proviso or a stipulation." *Merriam Webster's Collegiate Dictionary,* 10th ed. (1997). A "proviso" is "an article or clause (as in a contract) that introduces a condition" and a "stipulation" is "something stipulated; ... a condition, requirement, or item specified in a legal instrument." *Id.* Thus, the plain and unambiguous terms of the Policy require that, to constitute a Buy–Sell Agreement under the Policy, an agreement must expressly identify the payments as compensation for Dr. McMillan's ownership interest as a result of his becoming totally disabled. This requirement is reinforced

in the Explanation of Benefits section, where the Policy states that a Buy–Sell Agreement "sets forth the terms for the purchase of [Dr. McMillan's] ownership interest in [Oak Road] because of his Total Disability." (Policy at OC–2.) Plaintiffs' actual intent regarding these payments, unless identified in the Consulting Agreement itself, is not relevant to determining whether the Agreement constitutes a Buy–Sell Agreement under the Policy. In other words, Plaintiffs cannot recast the Consulting Agreement to be something it is not.[11]

Because no reasonable juror could find payments to Dr. McMillan were made in fulfillment of a Buy–Sell Agreement, as required under the Policy, summary judgment on Plaintiffs' claim for breach of contract and for bad-faith refusal to pay under O.C.G.A. § 33–4–6 is warranted.[12]

### B. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on their claim for breach of the Policy and for bad-faith damages under O.C.G.A. § 33–4–6. Plaintiff's motion must be denied for the same reasons which warrant the entry of summary judgment in favor of Provident on its motion—namely, that Oak Road is not entitled to benefits under the Policy because (1) Dr. McMillan was not engaged in active full-time work when he became totally disabled; and (2) Dr.

---

**11.** The Consulting Agreement also contains an integration clause expressly disclaiming representations and understandings concerning the subject matter of the Consulting Agreement not reflected in the agreement itself. This clause further undermines Plaintiffs' argument that the Court should ignore the plain language of the Consulting Agreement in favor of their alleged understanding concerning the purpose of the consulting fees.

**12.** The Court having determined summary judgment is warranted based on either of Provident's first two arguments, it is not necessary for the Court to address Provident's third argument—that Dr. McMillan's ownership interest was not purchased "by or through" Oak Road as required under the Policy.

McMillan's ownership interest in Oak Road was not purchased pursuant to the terms of a Buy–Sell Agreement. *See* Section II(A)(2) and (3), *supra.* Accordingly, summary judgment in favor of Plaintiffs is not appropriate.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED** that Provident's Motion for Summary Judgment is **GRANTED** and the Clerk of Court is **DIRECTED** to enter judgment in favor of Provident against Plaintiffs.