S96Q0130. PARK 'N GO OF GEORGIA, INC. v. UNITED STATES FIDELITY & GUARANTY COMPANY.
(471 SE2d 500)

HINES, Justice.

This case is before us on a certified question from the United States Court of Appeals for the Eleventh Circuit.[1] *USF&G v. Park 'N Go of Ga.*, 66 F3d 273 (11th Cir. 1995). The issue is whether an airport parking business' insurance coverage for damage to parked vehicles caused by flooding of the parking facility is limited by a "care, custody or control" exclusion in the insurance policy. The following facts are pertinent to our consideration.

During 1991 and 1992, Park 'N Go of Georgia, Inc., a Georgia corporation, operated a parking/shuttle service near Atlanta Hartsfield International Airport. The facility consisted of a fenced flat-surface 13-acre parking lot with an office building and entrance and exit gates at the front. There was a limited staff and no security system or security personnel. To enter the lot, a patron drove his vehicle alongside a ticket machine at the entrance gate and received a bar-coded ticket stamped with the date and time of entry and which contained a

---

[1] 1983 Ga. Const., Art. VI, Sec. VI, Par. IV.

purported disclaimer on the back.[2] There was no other lawful way for a customer to enter the lot. Upon entry, the patron selected a space, parked and locked his vehicle, took the keys with him, and waited for a Park 'N Go shuttle for transportation to the airport terminal. There was an option for the customer to have his vehicle washed, waxed, lubricated, or to have the oil changed at a separate service facility located next to the Park 'N Go lot.[3] If the Park 'N Go patron wished to use the service,[4] he filled out a work order form while in the Park 'N Go van on the way to the airport and left it along with keys to the vehicle with the van driver. The van driver then delivered the work order and keys to the service facility, and one of its employees would get the vehicle and bring it to the garage for the requested services. The servicing facility would then return the vehicle to its space on the Park 'N Go lot with the completed work order. Upon return, each customer was transported by the shuttle to where his vehicle was parked. In the case of a customer who had service of his vehicle, the Park 'N Go van driver would notify the garage that he was transporting such a customer, and a serviceman would bring the keys. Each patron then drove his vehicle up to a cashier's window located next to an exit lane, presented the bar-coded ticket, and paid the amount for parking calculated by a fee computer. The customer also paid the Park 'N Go cashier for any servicing of the vehicle. If a person drove to the exit window and could not produce a bar-coded ticket, then he was required to fill out a lost ticket form. The cashier would obtain a name, some proof of identification, and a showing that the person parked the vehicle, such as the stub of an airline ticket. After payment to the cashier, the customer then exited the facility. There was no other way for a customer to lawfully leave the Park 'N Go lot.

In 1991, Park 'N Go contracted with United States Fidelity & Guaranty Company (USF&G) for insurance of its business. USF&G issued a policy,[5] effective until November 1992, which provided various kinds of coverage. The policy included among other coverages (1) Garage Coverage Part-Liability Coverage (GCP-Liability Coverage) with a $1 million liability limit for any one accident or loss; (2) Ga-

---

[2] The back of the ticket stated: "This ticket must be presented to the cashier on leaving the parking area. Charges are for use of parking space only. This company assumes no responsibility for loss through fire, theft, collision or otherwise to the car or contents."

[3] The facility was called Airport Lube and part of its service department was within the chain link fence surrounding the Park 'N Go lot. It is unclear whether there was any common ownership or any legal business relationship between the two entities.

[4] Park 'N Go's vice president testified that less than five percent of customers elected to use the service.

[5] Policy No. 1MP1334231140 defined "auto" as "a land motor vehicle, trailer or semi-trailer." Covered autos expressly included "autos left with you for service, repair, storage, or safekeeping." The "Physical Damage Coverage" provision in the policy expressly covered the insured for damages caused by flood.

rage Coverage Part-Garage Keepers Coverage (GCP-Garage Keepers Coverage) with a $250,000 liability limit for any one event; and (3) Commercial General Liability Coverage (CGL-Coverage) with a $1 million liability limit for any one accident or loss. The GCP-Liability Coverage and the CGL-Coverage provisions expressly excluded liability for damage to "personal property in the care, custody or control of the insured." The GCP-Garage Keepers Coverage provided coverage for: "all sums the 'insured' legally must pay as damages for 'loss' to a covered 'auto' or . . . left in the 'insured's' care while the 'insured' is attending, servicing, repairing, parking or storing it in your garage operations. . . ."

While the policy was in effect, the Park 'N Go lot was flooded as the result of torrential rains and more than 200 automobiles parked in the lot were damaged. A group of Park 'N Go patrons filed a class action suit against Park 'N Go in the State Court of Fulton County seeking recovery for the flood damages to their vehicles. They alleged the existence of a bailment relationship and that Park 'N Go was negligent.

USF&G filed a complaint against Park 'N Go in the United States District Court for the Northern District of Georgia seeking declaratory judgment regarding its obligations under the insurance policy. USF&G moved for summary judgment contending that its exposure was limited to $250,000 under the GCP-Garage Keepers Coverage portion of the policy rather than $1 million as provided in the GCP-Liability Coverage and the CGL-Coverage parts of the policy. The district court granted summary judgment to USF&G after concluding that "because the autos parked and damaged in [Park 'N Go's] lot were necessarily in the care of [Park 'N Go], that provision of the policy excluding from coverage personal property in the care, custody or control of the insured applies."

On appeal, the Eleventh Circuit determined that resolution of the case involved unsettled questions of Georgia law regarding the existence of a bailment relationship, the validity of the ticket disclaimer, and the interpretation of the insurance contract. It certified the following question:

> Does the "care, custody or control" exclusion in the Garage Keepers Coverage portion of the insurance contract apply and limit Park 'N Go's insurance coverage to $250,000?[6]

---

[6] The "care, custody or control" exclusion is in the GCP-Liability Coverage and CGL-Coverage portions of the policy and not the provision for GCP-Garage Keepers Coverage; therefore, we construe the inquiry to be: "Does the 'care, custody or control' exclusion in the Garage Coverage Part-Liability Coverage portion of the insurance contract apply and limit Park 'N Go's insurance coverage to $250,000 under the Garage Keepers Coverage?"

*Care, Custody or Control and the Existence of a Bailment.*

"Care, custody or control" as it is used in the exclusions at issue is defined by both the specific terms of the insurance policy and by the law of bailment. A bailment occurs when there is "a delivery of goods or property upon a contract, express or implied, to carry out the execution of a special object beneficial either to the bailor or bailee or both and to dispose of the property in conformity with the purpose of the trust." OCGA § 44-12-40. That is, a bailment relationship is created when one party is involved in an undertaking for a consideration to safeguard the personal property of another and exercises complete dominion at all times over the property. See *Buena Vista Loan &c. Bank v. Bickerstaff*, 121 Ga. App. 470, 475 (174 SE2d 219) (1970). For all practical purposes, Park 'N Go, by virtue of its lot design and processing procedures, exercised complete dominion over the vehicles parked on its lot. The fact that in most instances the vehicle owner retained the keys did not alter the measure of control held by Park 'N Go so as to negate the existence of a bailment. Cf. *Goodyear Clearwater Mills v. Wheeler*, 77 Ga. App. 570 (49 SE2d 184) (1948).

OCGA § 44-12-77 unequivocally recognizes the bailment relationship between garage owners and their customers. See *Bunn v. Broadway Parking Center*, 116 Ga. App. 85 (156 SE2d 464) (1967), applying former Code § 12-403. It provides:

> The relationship of the owner of an automobile and the owner of the garage in which the automobile is stored is that of bailor and bailee. The bailee is bound to use ordinary care for the safekeeping and return of the automobile.

The fact the Park 'N Go facility was an open-air lot did not render it any less of a "garage" for the purposes of the statutory presumption. See *Goodyear*, supra at 571. There is no basis in the law for a distinction. Nor is there any reason in fact here to distinguish Park 'N Go's situation. The lack of an enclosed storage structure did not diminish the degree of control exercised by Park 'N Go. It was unquestionably a bailee of the vehicles parked at its facility. When the insured is a bailee of property, that property has generally been found to be in the "care, custody or control" of the insured within the meaning of the insurance coverage exclusion. *Royal Indem. Co. v. Smith*, 121 Ga. App. 272, 274 (173 SE2d 738) (1970).

*Effect of the Disclaimer.*

The purported disclaimer printed on the back of the parking tickets did not, in and of itself, alter the existence of the bailment

relationship between Park 'N Go and its customers.[7] The mere receipt of a printed notice of the bailee's attempt to disavow liability is insufficient to do so. *American Laundry v. Hall*, 27 Ga. App. 717 (1) (109 SE 676) (1921); see also *Davidson v. Ramsby*, 133 Ga. App. 128 (210 SE2d 245) (1974). In order to uphold such a disclaimer, at a minimum there must be affirmative evidence of the bailor's awareness of it. See *Haynie v. A & H Camper Sales,* 233 Ga. 654 (212 SE2d 825) (1975); *White v. Atlanta Parking Svc. Co.*, 139 Ga. App. 243 (228 SE2d 156) (1976); *Davidson v. Ramsby*, supra; *Brown v. Five Points Parking Ctr.*, 121 Ga. App. 819 (175 SE2d 901) (1970). Park 'N Go employed no mechanism, either in its parking procedures or on the parking ticket itself for patron acknowledgment of the disclaimer. Therefore, it was not effective to remove the parked vehicles from Park 'N Go's "care, custody or control."

*Intention of the Parties and Construction of the Policy.*

An insurance policy is governed by the ordinary rules of contract construction.[8] *Progressive Preferred Ins. Co. v. Brown*, 261 Ga. 837 (413 SE2d 430) (1992). The hallmark of contract construction is to ascertain the intention of the parties. OCGA § 13-2-3; *Golden v. Nat. Life &c. Ins. Co.*, 189 Ga. 79, 87 (2) (5 SE2d 198) (1939). However, when the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent. *Health Svc. Centers v. Boddy*, 257 Ga. 378, 380 (2) (359 SE2d 659) (1987). The terms of the policy provisions at issue are clear and unambiguous. On its face, the "care, custody or control" prohibition contained in both the GCP-Liability Coverage and CGL-Coverage excludes liability for property held by Park 'N Go as a bailee. The Garage Keepers portion of the policy by its express terms contains the needed coverage for property within the insured's "care, custody or control." It bridges any gap in coverage created by the bailment exclusion. Otherwise the GCP-Liability Coverage and the Garage Keepers Coverage result in redundancy or require that the term "care" have disparate meanings in parts of the same policy.

Even going beyond the clear language of the policy to consider the substantial purpose behind the exclusion, the conclusion is the same. See *Friedman v. Friedman*, 259 Ga. 530, 532 (3) (384 SE2d 641) (1989). The Garage Coverage Liability and Commercial General Liability contemplate payment in situations where the ordinary degree of

---

[7] OCGA § 44-12-45 specifies when an act of God or contract exception is available as a defense to a bailee. It does not apply to an absolute disclaimer of liability from all perils. *White v. Atlanta Parking Svc. Co.*, 139 Ga. App. 243, 245 (2) (228 SE2d 156) (1976).

[8] OCGA § 13-2-2 et seq.

care is the measure of liability, and the premium is determined on that basis. Liability for damage to property in the care, custody, or control of the insured where there is a bailment is controlled by different legal principles which result in increased risk. This generally translates into a higher premium commensurate with the greater risk. The Garage Keepers insurance provides property coverage for the excluded higher risk situation. Thus, the exclusion serves to eliminate securing the same coverage for a cheaper rate under liability coverage. *Royal Indem. Co.,* supra at 275. It is reasonable that an insured, such as Park 'N Go would opt for a lesser limit of liability for coverage carrying an enhanced premium, especially when assessing the probability of a single instance of catastrophic injury to its customers' vehicles and contents, that is, more than a quarter of a million dollars of damage to bailed property as the result of one event.

Park 'N Go's claim that application of the exclusion, given the nature of its business, renders meaningless the GCP-Liability Coverage portion of the policy is unavailing. The liability provision provided valuable coverage. Compare *USF&G v. Gillis,* 164 Ga. App. 278 (296 SE2d 253) (1982). Park 'N Go's business consisted of more than operation of a facility for the temporary storage and possible service of vehicles. It provided transport for airport patrons. This entailed not only the risk of bodily injury but also the possibility of damage to other encountered vehicles, which were neither owned nor operated by the insured nor entrusted to it for bailment.

The "care, custody or control" exclusion applies and limits Park 'N Go's coverage for the flood damaged vehicles to that provided by the Garage Keepers Part of its insurance contract with USF&G.[9]

*Question answered. All the Justices concur.*

DECIDED JUNE 17, 1996.

*Wagner & Johnston, C. David Johnston, Ralph A. Jordan,* for appellant.

*Carter & Ansley, Ben Kingree III, Kenton J. Coppage,* for appellee.

---

[9] The finding is limited to coverage afforded by USF&G Policy No. 1MP1334231140. This Court makes no determinations regarding any alleged negligence or misrepresentation by USF&G and/or its agents as might affect contractual liability because those issues are not before us.