Laura A. **OWENS, individually and on behalf of a class of all others similarly situated, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**CIVIL ACTION NO. 2:14-CV-00074-RWS**

United States District Court, N.D. Georgia, Gainesville Division.

Signed September 27, 2016

*Attractions, Inc.,* 812 F.3d 614, 620–21 (8th Cir.2015).

1346

**1348**

M. Scott Barrett, Barrett Wylie, LLC, Bloomington, IN, John Chapman Bell, Jr., Leroy Weathers Brigham, Bell & Brigham, Augusta, GA, John W. Oxendine, John Oxendine, P.C., Atlanta, GA, Michael Jordan Lober, Lober, Dobson & Desai, LLC, Roswell, GA, Todd L. Lord, Law Office of Todd L. Lord, Cleveland, GA, William Gregory Dobson, Lober, Dobson & Desai, LLC, Macon, GA, for Plaintiff.

Brendan Ballard, Phillip E. Stano, Irene A. Firippis, Sutherland, Asbill & Brennan, LLP, Washington, DC, Thomas W. Curvin, Atlanta, GA, for Defendant.

### ORDER

Richard W. Story, United States District Judge

This case comes before the Court on Plaintiff's Motion for Partial Summary Judgment [74], Defendant's Motion for Summary Judgment [76], and Defendant's Motion to Exclude the Report and Testimony of Professor Jeffrey W. Stempel. After a review of the record, the Court enters the following Order.

### Background

This case arises out of Metropolitan Life Insurance Company's ("MetLife") administration of life insurance death benefits paid on employee benefit plans. On April 17, 2014, Plaintiff Laura Owens, on behalf of herself and of a class of all others similarly situated, brought this action pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

Plaintiff Laura Owens is the beneficiary of a life insurance policy that provided $95,000.00 in coverage on her husband's life (the "Policy"). (Def.'s SOMF., Dkt. [76–2] .¶ 61.) Owens's husband, Robert F. Owens, was employed prior to his death on April 7, 2012 by CB Richard Ellis, Inc. and was a participant in the CB Richard Ellis Group Insurance Plan (the "Plan"). (Pl.'s SOMF, Dkt. [74–1] ¶ 1.) The Policy provides, "We will pay the Life Insurance in one sum. Other modes of payment may be available upon request." (Id. ¶ 12.)

On or around May 21, 2012, CB Richard Ellis, Inc., submitted a claim for life insurance benefits on Plaintiffs behalf. (Id. ¶ 19.) MetLife approved the claim and established a "Total Control Account" in Owens's name (the "TCA").[1] (Id. ¶ 20.) MetLife provided a book of blank drafts to Plaintiff, which allowed her to withdraw funds from the TCA in increments of $250 or more. (Def.'s SOMF, Dkt. [76–2] ¶ 81– 82.) The TCA accrued interest at a rate tied to one of two indices; the rate fluctuated weekly but the annual effective interest rate was no lower than 0.50%. (Id. ¶ 84.)

MetLife's practice is to hold payable benefits in its own general account until called upon to transfer funds to cover drafts drawn on Total Control Accounts. (Id. ¶ 25.) This practice extended to the benefits paid on Plaintiffs claim. MetLife established a TCA for Ms. Owens, paying interest at the rate of 0.50%. (Pl.'s SOMF, Dkt. [74–1] ¶ 27.) The funds remained in MetLife's general account, earning interest for MetLife at a higher rate than that paid to Plaintiff. (Id. ¶ 28–29.)

This practice is the basis of Plaintiffs Complaint. Plaintiff alleges that MetLife

---

**1.** "Total Control Account" is the trade name used by Defendant for what is known in the life insurance industry as a "retained asset account." (Pl.'s SOMF, Dkt. [74–1] ¶ 21.)

profited from "investing [Plaintiffs] benefits for its own account." (Id. ¶ 17.) Plaintiff further alleges that MetLife did not disclose that profit or similar profits to Ms. Owens or to the Plan's sponsor or administrator. (Id. ¶ 18.) Plaintiff claims that this conduct constitutes a breach of fiduciary duty.

Plaintiff alleges that MetLife routinely profits in this manner from plan benefits paid on group life insurance policies. (Compl., Dkt. [1] ¶¶ 19-25.) Plaintiff claims that this practice violates the terms of the payment clauses in these policies, which provide "We will pay the Life Insurance in one sum. Other modes of payment may be available upon request." (Id. ¶ 20.)

Plaintiff claims she exhausted her administrative remedies when, on or around November 21, 2013, Plaintiff submitted a claim on the Policy to MetLife. (Id. ¶¶ 26-28.) MetLife did not respond to Plaintiffs claim within 90 days, as required by the ERISA addenda to the Plan's Certificates of Insurance. (Id.)

Plaintiff now brings her claims pursuant to ERISA on behalf of herself and the class of others similarly situated.[2] Plaintiff further brings claims on behalf of a subclass of Georgia residents. Plaintiff claims that MetLife functioned as a fiduciary when it engaged in the conduct described above. (Id. ¶ 31.) Further, Plaintiff claims that MetLife is a party in interest to the Plan. (Id. ¶¶ 36-37.) On those bases, Plaintiff brings the following causes of action: breach of the duty of loyalty imposed by ERISA § 404(a)(1)(A) (Count I); breach of the fiduciary duties imposed by ERISA § 406(b)(1) (Count II), § 406(a)(1)(B) (Count III), and § 406(a)(1)(C) (Count IV);

and postmortem interest for the Georgia subclass (Count VI).[3]

On November 30, 2015, Plaintiff filed a Motion for Partial Summary Judgment [75] as to the five remaining counts, and, on the same day, Defendant filed a Motion for Summary Judgment [76]. Defendant also filed a Motion to Exclude the Report and Testimony of Professor Jeffrey W. Stempel ("Def.'s Mot. to Exclude") [75] that day. As an initial matter, Defendant's request for oral argument on its Motion to Exclude (Def.'s Reply in Supp. of Def.'s Mot. to Exclude, Dkt. [107]) is **DENIED**. The Court now considers the parties' arguments in turn.

### Discussion

### I. Motions for Summary Judgment

#### A. Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirma-

---

**2.** The Court does not address class certification in the present Order. Plaintiffs Motion for Class Certification has not yet been fully briefed before the Court. (See Dkt. [7].)

**3.** Count V, for declaratory relief regarding coverage by state insurance guaranty funds for the Georgia subclass, was dismissed on Defendant's Motion to Dismiss for Failure to State a Claim. (Dkt. [41].)

tive evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The applicable substantive law identifies which facts are material. Id. at 248, 106 S.Ct. 2505. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249–50, 106 S.Ct. 2505.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences that are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods. Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted); see also Matsushita, 475 U.S. at 586, 106 S.Ct. 1348 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## B. Discussion

■ Plaintiff brings several claims under both ERISA and Georgia law. She claims Defendant breached its fiduciary duties under ERISA when it opened a TCA in her name and kept a majority of the interest earned on the assets backing the account rather than sending her a single check for the entire amount owed her. ERISA §§ 404(a)(1)(A) and 406(b)(1) require Defendant be a fiduciary for liability to attach; ERISA §§ 406(a)(1)(B) and (C) require Defendant be a fiduciary and a party in interest. As defined by ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1102(21)(A). Defendant, as the plan administrator, was a fiduciary under this definition.

■ Not every action a fiduciary takes, however, is undertaken as a fiduciary. ERISA fiduciaries may wear multiple hats, and they "may have financial interests adverse to beneficiaries." Pegram v. Herdrich, 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Acting adversely to a beneficiary's interest alone is not enough. The actions must have been undertaken when "that person was acting as a fiduciary (that is, was performing a fiduciary function)" as well. Id. at 226, 120 S.Ct. 2143. Defendant was wearing its fiduciary hat when it created a TCA in Plaintiffs name and mailed her a blank draftbook for the account. Under trust law, which is used to inform the scope of fiduciary duties under ERISA, fiduciary administration includes performing duties imposed or exercising powers conferred by trust documents. Varity Corp. v. Howe, 516 U.S. 489, 502, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Distributing benefits as directed by the Policy falls with the scope of ERISA's fiduciary duties. Mogel v. Unum Life Ins. Co., 547 F.3d 23, 27 (1st Cir. 2008). Defendant was performing a

fiduciary function, and acting as a fiduciary, when it distributed benefits to Plaintiff.

██ Once benefits are paid in conformance with the policy, all of the insurer's fiduciary duties have been fulfilled. Since there are no more plan assets over which it can have discretionary authority, it is no longer a fiduciary. If, however, payment is not made in conformity with the policy, the insurer's status as a fiduciary remains. See Merrimon v. Unum Life Ins. Co., 758 F.3d 46, 58 (1st Cir. 2014) ("[A] life insurer discharges its fiduciary duties when it redeems a death-benefit claim through the establishment of [a retained asset account] as long as that method of redemption is called for by the plan documents." (citing a Department of Labor Guidance Letter)). While a guaranteed benefit policy is a plan asset, the assets of the insurer are not plan assets "solely by reason of the issuance of such policy." 29 U.S.C. § 1101(b)(2). Any assets backing the policy are not plan assets prior to coming due under the policy, nor are assets backing benefits once they are paid in conformity with the policy. The assets backing accrued but undistributed benefits, however, remain plan assets until actually paid. Similarly, disposition of benefits is a fiduciary duty, but payment in conformance with the policy terminates the fiduciary status. Mogel, 547 F.3d at 27 (citing Varity Corp., 516 U.S. at 502, 116 S.Ct. 1065). Thus, Defendant's status as a fiduciary, and Plaintiffs success on her claims, depends on whether payment in accordance with the policy occurred upon creation of the TCA in her name and her receipt of the blank draftbook on the account.[4] The Court addresses this initial inquiry before turning to Plaintiffs individual claims.

*1. Payment in Conformance with the Policy*

██ The Policy's language must be construed according to Georgia law. "[C]onstruction of a contract is a question of law for the court." Bituminous Cas. Corp. v. Advanced Adhesive Tech., Inc., 73 F.3d 335, 337 (11th Cir. 1996). In Georgia, an insurance policy is governed by the ordinary rules of contract construction. Park 'N Go v. U.S. Fidelity & Guar. Co., 266 Ga. 787, 471 S.E.2d 500, 503 (Ga. 1996). The hallmark of contract construction is to ascertain the intent of the parties. Id; see also O.C.G.A. § 13–2–3. When the terms of a contract are clear and unambiguous, however, the court should look to the contract alone to find the parties' intent. Park 'N Go, 471 S.E.2d at 503. "[U]nambiguous terms in an insurance policy require no construction, and their plain meaning will be given effect . . . ." Payne v. Twiggs Cnty. Sch. Dist., 269 Ga. 361, 496 S.E.2d 690, 691–92 (1998). If, however, "a policy is ambiguous, or is capable of two reasonable interpretations, it is construed in the light most favorable to the insured and against the insurer." Giddens v. Equitable Life Assurance Soc'y, 445 F.3d 1286, 1297 (11th Cir. 2006).

██ In determining whether a provision is ambiguous, the relevant inquiry is what a reasonable person in the position of the insured would understand the terms of the contract to mean, and the policy should be read as a layman would read it. York Ins. Co. v. Williams Seafood of Albany, Inc., 223 F.3d 1253, 1255 (11th Cir 2000). "The natural, obvious meaning [of a policy provision] is to be preferred over any curious, hidden meaning which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover." Truitt Oil & Gas Co. v. Ranger Ins.

---

4. Plaintiff's state law claim also depends on whether payment was made under the Policy. O.C.G.A. § 33–25–10 requires payment of postmortem interest, which is computed based on the date of payment of life insurance benefits by the insurer.

Co., 231 Ga.App. 89, 498 S.E.2d 572, 573 (1998); N. Ga. Petroleum Co. v. Federated Mut. Ins. Co., 68 F.Supp.2d 1321, 1325 (N.D. Ga. 1999). Hence, if the policy would be confusing to a layman, the policy is ambiguous, and it will be construed against the drafter.

The policy states that Defendant "will pay the Life Insurance in one sum. Other modes of payment may be available upon request."[5] Thus, the question in this case is whether Defendant's creation of the TCA constituted payment of the Policy proceeds in one sum. While the Eleventh Circuit has yet to address this question, other federal courts have. Garrison v. Jackson Nat. Life. Ins. Co., 908 F.Supp.2d 1293, 1298 (N.D. Ga. 2012). In Garrison, this district faced policy language similar to that present here. The life insurance policy stated that benefits would be paid "in one sum unless otherwise agreed." Id. at 1295. While the insurance company claimed that depositing benefits into a Beneficiary Access Account[6] constituted payment in one sum, the court, relying in part on Mogel, disagreed. Garrison, 908 F.Supp.2d at 1300. The plain meaning of "payment," according to Garrison, is "performance of an obligation, usually by the delivery of money. Performance may occur by delivery and acceptance of things other than money, but there is a payment only if money or other valuable things are given and accepted in partial or full discharge of an obligation." Id. at 1299 (quoting Payment,

Black's Law Dictionary (7th ed. 1999)). "Delivery requires 'the giving or yielding of possession or control of something to another.'" Id. (quoting Delivery, Black's Law Dictionary (7th ed. 1999)). A sum is "a quantity of money." Id. (quoting Sum, Black's Law Dictionary (7th ed. 1999)). Thus, the plain meaning of payment in one sum is "delivery of possession or control of a quantity of money to the beneficiary." Id.

By retaining the beneficiary's money in a Beneficiary Access Account, the insurer kept possession and control over the proceeds, giving the beneficiary only the "ability to request delivery of a quantity of money by writing a draft on the account." Id. at 1299–300. This did not fulfill the payment requirements of the life insurance policy. While the insurer contended that the Beneficiary Access Account gave effective possession by allowing the beneficiary to access the entire amount by writing a draft on the account, such an interpretation did not align with the plain meaning of the policy's language, which required actual delivery. Id. at 1300. The court noted that if "delivery of effective possession was contemplated by the policy, [it] would expect the policy to say so." Id.

The Court finds the reasoning in Garrison persuasive. The language of the Policy, which states "We will pay the Life Insurance in one sum," is unambiguous. Its plain meaning, as discussed in Garrison, requires "delivery of possession or control of a quantity of money to the beneficiary."[7]

**5.** Defendant argues that even if payment by TCA was not permitted under the Policy's one sum language, the Policy also provided that "[o]ther modes of payment may be available upon request." It claims that when Plaintiff submitted her signed claims form without writing the word "check" on it, she essentially requested a TCA as an alternative mode of payment. This form, however, treated a TCA as the default payment option. Under the Policy's language, payment in one sum is the default. Plaintiff did not request payment by

check, nor was she so obligated; it was guaranteed to her under the Policy.

**6.** The Beneficiary Access Account in Garrison is another trade name for a retained asset account. It operates in the same fashion as Defendant's TCAs.

**7.** Defendant claims that during the policy implementation period, CB Richard Ellis, Inc. selected TCA accounts as the default payment option under the Plan. It urges the Court to consider this as evidence of the parties' intent

Id. at 1299. A lay person would read this language as requiring a single check be sent to the beneficiary, not as permitting a TCA. While the TCA might provide effective possession of the benefits due, it does not give the beneficiary actual possession. Defendant maintained actual possession of the benefits in its general account. It had control over where the benefits in its general account would be invested. Plaintiff did not have possession or control of the benefits.

She merely had the ability to request possession by writing a draft on the account. Garrison, 908 F.Supp.2d at 1299–300. Plaintiffs account was credited with the full amount of her benefits, which she was able to access by writing drafts on the account. This delivery of effective possession, however, does not comport with the plain language of the Policy's requirement of delivery of actual possession. Id. at 1300.

Defendant argues that Mogel, upon which the court in Garrison heavily relied, has lost its persuasiveness due to subsequent decisions in multiple circuits. The Court, it argues, should follow these decisions instead. Defendant's reliance on these cases is misplaced since they are factually distinguishable. Indeed, they themselves distinguish Mogel based on the

difference in the policy language at issue. For example, the policy in Merrimon stated that benefits would be paid by "mak[ing] available to the beneficiary a **retained asset account**." Merrimon, 758 F.3d at 59 (emphasis in original). Thus, when the insurer created such an account and gave access to the beneficiary, payment was made under the policy; the money retained ceased to be a plan asset, and fiduciary duties were no longer owed under ERISA. Id. at 56. The court in Merrimon explicitly states that Mogel "is not at odds with the conclusion" since "Mogel involved a plan that contained a specific directive to pay beneficiaries in a lump sum."[8] Id. Other courts addressing policy language similar to that in Merrimon have reached the same conclusion as to Mogel's applicability under the facts. See Edmonson v. Lincoln Nat'l Life Ins. Co., 725 F.3d 406, 425 (3d Cir. 2013) ("But the terms of the policy in Mogel required an immediate lump sum payment upon receipt of proof of a claim. Because the policy here is silent as to the form of payment, Lincoln had discretion as to how to comply with its requirements ...."); Faber v. Metro. Life Ins. Co., 648 F.3d 98, 106–07 (2d Cir. 2011) ("Mogel is better understood as predicated on the fact, not present here, that the insurer failed to abide by plan terms requiring it to distribute benefits in lump

in interpreting the Policy. While Plaintiff disputes whether such an election actually occurred, the Court finds this disputed fact not material. Although Georgia law directs the Court to determine the intent of the parties in the construction of a contract, when the policy's language is unambiguous, the language alone is used to determine that intent. Park 'N Go, 471 S.E.2d at 503. Since the Policy's language with regards to payment is unambiguous, this extrinsic evidence need not be addressed and is thus not material. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**8.** In Vander Luitgaren v. Sun Life Assurance Co., 765 F.3d 59 (1st Cir. 2014), the First

Circuit reinforced this factual distinction. The policy stated that benefits would be "payable by a method other than a lump sum." Id. at 64. The First Circuit discussed the retained asset account as one of the permissible other options. Id. The issue was whether choosing a retained asset account as the "method other than a lump sum" breached the insurer's fiduciary duty, not whether the account itself constituted lump sum payment. Id. The opinion was thus consistent with Mogel. Id. at 65 n.5 ("[In Mogel], the plan language specified that benefit payments would 'be made in one lump sum,' and we held the insurer to that language.").

sums."). The facts here are more analogous to those in <u>Mogel</u> and <u>Garrison</u>; the Policy language is in fact indistinguishable.

Defendant further argues, however, that since <u>Merrimon</u> and others like it hold that payment can be made via retained asset accounts, they should have gone further and overturned <u>Mogel</u>. Defendant argues that if TCAs constitute "payment," then they also constitute "payment in one sum." (Br. in Supp. of Def.'s Mot. for Summ. J., Dkt. [76–1], at 25-26.) This argument reads too much into these cases. These cases hold that retained asset accounts constitute payment, and thus discharge any fiduciary duties imposed by ERISA, "as long as that method of redemption is called for by plan documents." <u>Merrimon</u> at 58, (quoting DOL Guidance Letter at 11).[9] As discussed above, the Policy's plain language does not call for redemption in such a manner.

Defendant's concern that the Court's definition of payment will result in the inability to make payments by check is unfounded. After Defendant sends a check for benefits due under a policy, it retains the funds backing the check until it is cashed by the beneficiary. (Br. in Supp. of Def.'s Mot. for Summ. J., Dkt. [76–1], at 36.) Under Defendant's theory, since it will still possess the funds, payment would not be made until the check was cashed, and any investment of the funds until then would breach Defendant's fiduciary duty.

(<u>Id.</u>) This characterization, however, rests on the false premise that a check constitutes payment because it gives the beneficiary the ability to access funds despite their remaining in Defendant's possession. If that were the case, Defendant would be correct, for as held above, access without possession does not satisfy the obligation of payment in one sum under the contract. However, a check constitutes payment for another reason. "If an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken." O.C.G.A. § 11-3-310. Suspension remains in effect until the check is dishonored or paid, with payment resulting in discharge of the obligation. <u>Garrison</u>, 908 F.Supp.2d at 1301 (citing O.C.G.A. § 11-3-310(b)(1)). The check is legally analogous to delivery of money in the amount specified on the check. <u>Id.</u> at 1301. Thus, if Defendant had sent Plaintiff a check, the obligation to deliver the benefits as a quantity of money would have been suspended upon Plaintiffs receipt of the check, with the obligation discharged once the check was cashed. "The fact that [Defendant] would have retained actual possession of the proceeds until the check was cashed is legally irrelevant" because the check's delivery is treated as the legal equivalent of delivery of a quantity of money.[10] <u>Id.</u>

**9.** Defendant recognizes this important nuance in its Motion for Summary Judgment: "The First, Second, and Third Circuits have held that an insurer does not violate ERISA when it pays benefits by establishing an interest-bearing account with an accompanying draftbook rather than issuing a single check to the beneficiary, *so long as this form of payment is consistent with plan and policy terms.*" (Br. in Supp. of Defs Mot. For Summ. J., Dkt [76–1], at 11 (emphasis added)).

**10.** Defendant's delivery of the draftbook does not result in a similar suspension of the obli-

gation to pay since the drafts were not negotiable instruments. A negotiable instrument must be "payable to bearer or order at the time it is issued or first comes into possession of a holder," O.C.G.A. § 11-3-104(a)(1), it must be "a signed writing," and it must be for "a fixed amount." O.C.G.A. § 11-3-104 cmt. 1. It is undisputed that the drafts Plaintiff received were not signed, nor were they made payable to order or bearer or for a fixed amount. (Pl.'s SOMF, Dkt. [74–1], ¶¶ 42–45.) The blank drafts were therefore not negotiable instruments and could not suspend Defen-

In conclusion, the Policy, which stated "We will pay the Life Insurance in one sum," required actual delivery of the proceeds due to Plaintiff as beneficiary. The creation of the TCA in her name and delivery of a blank draftbook did not satisfy this requirement of the Policy. Thus, the assets backing the TCA, as accrued yet unpaid benefits, are plan assets for which Defendant acts as a fiduciary. This failure to make payment under the terms of the Policy likewise did not discharge Defendant's fiduciary status with regard to administration of the plan.

### 2. ERISA Claims

In her complaint, Plaintiff alleges various violations of the fiduciary duties imposed on Defendant by ERISA. A beneficiary may bring a civil action "for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109 creates liability for a "person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter ...." 29 U.S.C. § 1109(a). Remedies include reimbursing any losses resulting from a breach, "restoring to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary," and other equitable or remedial relief deemed appropriate by the Court. Id.

#### a. Count I—ERISA § 404(a)(1)(A)

■ Count I alleges that Defendant breached the fiduciary duties it owed Plaintiff under ERISA § 404(a)(1)(A), which states that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administer-

ing the plan." 29 U.S.C. § 1104(a)(1)(A). Plaintiff claims that by choosing to distribute benefits by use of a TCA rather than sending a single check, Defendant put its own interests over that of participants and beneficiaries, thus breaching this duty of loyalty. (Compl., Dkt. [1] ¶ 48.)

Defendant cites to Vander Luitgaren v. Sun Life Assurance Co., 765 F.3d 59, 64 (1st Cir. 2014), for the proposition that this section of ERISA is not breached as long as "the chosen modality [of payment] does not unfairly diminish, impair, restrict, or burden the beneficiary's rights." Since, Defendant argues, Plaintiff could access the entire amount of her benefits at any time through her TCA, and since the TCA earned more interest than her personal checking account, her rights were not unfairly impacted. Vander Luitgaren, however, dealt with selecting a method of payment from the several possibilities permitted under the policy. While Vander Luitgaren asked whether choosing payment via a retained asset account from among many options violated the insurer's fiduciary duties, the question here is whether choosing payment via a TCA, when the policy plainly mandates payment in one sum, violates Defendant's fiduciary duties.

The Court finds that there is a genuine issue of material fact with regard to whether Defendant acted solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and to defray reasonable expenses. Thus, both Plaintiffs and Defendant's motions for summary judgment as to Count I are **DENIED.**

#### b. Count II—ERISA § 406(b)(1)

■ Count II alleges that Defendant violated ERISA § 406(b)(1), which prohibits a fiduciary from dealing "with

dant's obligation to pay Plaintiff. Garrison,

908 F.Supp.2d at 1302.

the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). This section is to be broadly construed in light of ERISA's statutory scheme, which evidences Congress' concern with protecting plan beneficiaries in passing ERISA. Leigh v. Engle, 727 F.2d 113, 126 (7th Cir. 1984). Liability may "be imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith.'" Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1213 (2d Cir. 1987) (quoting Cutaiar v. Marshall, 590 F.2d 523, 528 (3d Cir. 1979)).

It is undisputed that the assets backing the liabilities in Plaintiffs TCA were held in Defendant's own general account where they were invested along with assets backing the TCAs of others. (Pl.'s SOMF, Dkt [74–1] ¶ 28.) While some of the interest earned was passed along to Plaintiff, Defendant kept a portion for itself. (Id. ¶ 29.) As discussed above, these assets were plan assets. Even if this was not done in bad faith, Defendant violated ERISA § 406(b)(1) when it used plan assets to generate investment income for its own account. Thus, Plaintiffs motion for summary judgment as to Count II is **GRANTED**, and Defendant's motion for summary judgment as to Count II is **DENIED**.

### c. Count III—ERISA § 406(a)(1)(B)

■ Count III alleges that Defendant violated ERISA § 406(a)(1)(B), which states "Except as provided in section 1108 of this title: A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(B). Defendant was a party in interest since it was a fiduciary with regard to the Plan. 29 U.S.C. § 1002(14)(A)("The term 'party in interest' means, as to an employee benefit plan—

any fiduciary . . . ."). Thus, this claim depends on whether Defendant's scheme of creating a TCA in Plaintiff's name while keeping the assets backing that liability in its general account constituted a loan.

To lend is defined as "[t]o allow the temporary use of (something), sometimes in exchange for compensation, on condition that the thing or its equivalent be returned." Lend, Black's Law Dictionary (7th ed. 1999). Defendant's contention that it could not lend itself the assets backing the TCA liabilities because it had already given Plaintiff full control over the assets is unavailing. Defendant had temporary use of the assets backing the TCA liability between the time the account was set up and the time Plaintiff withdrew funds from the account. This falls within the definition of lending. It is no matter that the assets never physically left Defendant's possession. Thus, Defendant, a fiduciary with respect to the plan, allowed a loan of assets between the plan and a party in interest, itself. Plaintiff's motion for summary judgment as to Count III is therefore **GRANTED**, and Defendant's motion for summary judgment as to Count III is **DENIED**.

### d. Count IV—ERISA § 406(a)(1)(C)

■ Count IV alleges that Defendant violated ERISA § 406(a)(1)(C), which states "Except as provided in section 1108 of this title: A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). ERISA § 1108(b)(2) sets forth an exception to liability under this provision: "Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than

reasonable compensation is paid therefor." Since Defendant has taken the position that payment occurred, and thus no further fiduciary duties were owed, it has not argued that this exception applies. Having ruled, however, that payment did not in fact occur under the terms of the Policy, unresolved factual issues remain as to its applicability. There is a genuine issue of material fact with regard to whether this exception applies. Thus, Plaintiff's and Defendant's motions for summary judgment as to Count IV are **DENIED**.

### 3. State Law Claim

█ Plaintiffs final claim is for statutory interest for unpaid life insurance benefits under Georgia law. OCGA § 33–25–10(a) requires insurers to "pay interest on proceeds or payments under any individual policy of life insurance." It also applies to group life insurance policies. O.C.G.A. § 33–27–4. "[W]hen a claim for the policy proceeds is filed with the insurer, interest shall be computed daily from 30 days after the date the claim is filed until the date of payment at the rate of 12 percent." O.C.G.A. § 33–25–10(b)(2). "[P]ayment shall be deemed to have been received by a resident when manually delivered by an agent or representative of the insuring company or when deposited by the insuring company in the United States mail . . . ." O.C.G.A. § 33–25–10(d). As discussed above, Defendant failed to pay Plaintiff the proceeds due to her under the Policy. As such, she is entitled to interest at a rate of twelve percent from thirty days after the claim was filed until payment is actually made. Thus, Plaintiffs motion for summary judgment as to Count VI is **GRANTED**, and Defendant's motion for summary judgment as to Count VI is **DENIED**.

## II. Defendant's Motion to Exclude

Defendant's Motion [75] seeks to exclude the report and testimony of Professor Jeffrey W. Stempel. In ruling on the cross motions for summary judgment, interpretation of the unambiguous language of the Policy did not depend on Professor Stempel's report. As such, Defendant's Motion to Exclude the Report and Testimony of Professor Jeffrey W. Stempel [75] is **DENIED as moot**. Had, however, reliance on Professor Stempel's report been necessary, the Court finds no basis for his exclusion as an expert.

### Conclusion

In accordance with the foregoing, Plaintiff's Motion for Partial Summary Judgment [74] is **GRANTED** as to Counts II, III, and VI and **DENIED** as to Counts I and IV. Defendant's Motion for Summary Judgment [76] is **DENIED**. Defendant's Motion to Exclude the Report and Testimony of Professor Jeffrey W. Stempel [75] is **DENIED as moot**. The parties are directed to submit a proposed schedule for submission of the remaining briefing necessary for resolution of Plaintiffs Motion for Class Certification [7].

**SO ORDERED**, this 27th day of September, 2016.