**April 28, 2023**

# In the Court of Appeals of Georgia

A23A0574. JOINT DEVELOPMENT AUTHORITY OF JASPER COUNTY, MORGAN COUNTY, NEWTON COUNTY AND WALTON COUNTY v. McKENZIE et al.

A23A0596. STATE OF GEORGIA v. McKENZIE et al.

HODGES, Judge.

These cases come before us following the Morgan County Superior Court's denial of a petition to validate taxable revenue bonds in an amount up to $15,000,000,000 in connection with the proposed development and construction of an electric vehicle manufacturing facility by Rivian Horizon, LLC ("Rivian") in Morgan and Walton Counties (the "Project"). As discussed in more detail below, the State and the Joint Development Authority of Jasper County, Morgan County, Newton County, and Walton County (the "JDA") entered into numerous, complex agreements with Rivian which were structured so as to eliminate any obligation for

Rivian to pay ad valorem taxes as a way to induce Rivian to locate its facilities in Georgia. Several residents of the impacted counties (the "Intervenors") intervened in the action to oppose validation of the bonds and other aspects of the Project. The superior court denied validation of the bonds. It also found that Rivian's interest in the land for the Project would constitute a taxable estate for years and that its interest in the personal property for the Project would not be a bailment for hire, effectively rendering Rivian liable for ad valorem taxes. The JDA and the State now appeal, and we have consolidated the cases for issuance of an opinion.

The JDA and the State both allege the same enumerations of error, specifically, that the superior court erred (1) in denying validation of the bonds based on improper consideration of the Project's economic feasibility; (2) in denying validation of the bonds because of concerns that local infrastructure costs may offset the Project's benefits; (3) in denying validation of the bonds on the ground that the Bond Resolution waived performance audit requirements; (4) in finding that the rental agreement between the parties does not create a bailment for hire; and (5) in finding that the rental agreement does not create a usufruct. For the reasons outlined below, we affirm the superior court's finding that the nature of Rivian's interest in the

2

equipment of the Project is not a bailment for hire. We reverse the superior court as to its other findings.

The evidence in this case is undisputed, although the parties strongly disagree about the implications of that evidence. The JDA is a public body corporate and politic created pursuant to the Development Authorities Law of the State of Georgia (OCGA § 36-62-1 *et seq.*). It was created for the public purpose of developing and promoting, for the public good and general welfare, trade, commerce, industry and employment opportunities in its area of operation. In April 2022, it adopted a bond resolution permitting it to issue bonds to Rivian in connection with the Project. It also reached several agreements with the State and Rivian in furtherance of this Project, including, as is relevant to this case, an Economic Development Agreement ("EDA") and a Rental Agreement concerning the real and personal property involved with the Project. The documents extensively cross-reference each other as part of a comprehensive scheme.

*The Bond Resolution*

In April 2022, the JDA adopted a Bond Resolution in which it made a finding that

the Project will increase employment in the territorial area of the [JDA] and thereby develop and promote trade, commerce, industry and employment opportunities for the public good and the general welfare within the territory of the [JDA] and will promote the general welfare of the State; that the Project, and the use thereof will each further the public purposes of the Act for which the [JDA] was created, and that the Project and the [bonds] will each be sound, feasible, and reasonable.

Through the Bond Resolution, the JDA agreed to issue taxable revenue bonds

in one or more series, under such provisions, in aggregate principal amount of up to $15,000,000,000 [ ], and to apply the proceeds of the sale of the [b]onds (whether derived directly or indirectly from the issuance of the [b]onds) to finance, directly, in whole or in part, the acquisition, construction, and improvement of certain vehicle manufacturing and research, development, training, sales and/or service facilities, including potential battery manufacturing facilities, and related facilities on [particular land]. . .

Each bond bears interest at the rate of 6 percent annually and matures on December 1, 2047. The Bond resolution provides that the bonds and interest thereon

shall not be deemed to constitute a debt or liability of the State, or any political subdivision thereof, and its issuance shall not, directly or indirectly or contingently, obligate the [JDA], the State or any political subdivision thereof, including without limitation Jasper County, Morgan County, Newton County or Walton County, to levy any form of taxation

4

therefor or make any appropriation for their payment. Nothing in the bonds or in the Bond Resolution or the proceedings of the [JDA] authorizing the issuance of the bonds or in the Act shall be construed as creating a debt of the State, or any political subdivision thereof, including without limitation Jasper County, Morgan County, Newton County or Walton County, within the meaning of any constitutional or statutory provision of the State. . . . The bonds and any interest due thereon shall not be a general obligation, debt, or a liability of the [JDA] and does not constitute or give rise to any pecuniary liability or charge against the general credit of the [JDA], but shall be a limited obligation of the issuer payable solely from and secured by the security, all as described in and subject to limitations set forth in this Bond Resolution. (Emphasis omitted.)

*The Bond Purchase Agreement*

Through this agreement, the JDA "proposes to issue its revenue bonds . . . in the form of up to four (4) draw-down instruments in a maximum aggregate principal amount of $15,000,000,000." Advances for these bonds may only be made with respect to costs of the Project, including the costs of construction and purchasing equipment, and costs of issuing the bonds.

*The Economic Development Agreement*

In April 2022, Rivian, the State, and the JDA agreed to the EDA.[1] Through the EDA, Rivian will commit to construct an electric vehicle manufacturing plant, create 7,500 new jobs with an average annual wage of $56,000, and make a capital investment of at least $5,000,000,000. The JDA, several agencies of the State, and Rivian also agreed to performance and accountability standards related to Rivian's promises under the EDA. If Rivian fails to meet certain performance thresholds within a set time frame, it would be required to relinquish certain financial incentives received from the various agencies.

In exchange, the State and the JDA agreed to make available the facility site, which would be owned by the State, leased to the JDA, and then rented to Rivian pursuant to the Rental Agreement. The facility site consists of nearly 2,000 acres which spans Walton and Morgan Counties. The State and the JDA have obligations under the EDA to perform certain infrastructure work on the site, provide workforce training facilities and programs, and to provide certain financial incentives to Rivian. The State, through the Georgia Department of Economic Development, committed to a grant of $21,320,000 to the JDA for Rivian's benefit and a $111,307,760 grant

---

[1] The EDA has not yet been executed by the parties.

6

directly to the JDA to offset some of the costs, as well as providing certain state tax incentives for Rivian.

The EDA further provides that Rivian, in its capacity as a tenant of the Project, would be responsible for repayment of the project bonds and it specifies that the project bonds shall not be a general obligation of the JDA, Jasper County, Morgan County, Newton County, or Walton County. Instead, Rivian and the JDA agreed that the project bonds "shall be a special and limited obligation payable solely from the payments (actual or constructive) received from [Rivian] under the Rental Agreement." The EDA acknowledges the language from the Bond Resolution that provides that payment of the bonds is not the responsibility of the State, the JDA, or any of the JDA's member counties, and that project bonds are not a debt of those entities nor are they backed by the faith and credit of those entities.

So that the relevant taxing authorities are not deprived of revenue as a result of the parties' attempt to structure the deal to avoid ad valorem taxation on Rivian's part, the EDA also contains an agreement that Rivian would make payments in lieu of taxes, which is memorialized in a separate agreement (the "PILOT Agreement"). In the PILOT Agreement, the tax assessors of Morgan and Walton Counties would represent that they have determined Rivian's interest in the Project to be exempt from

ad valorem taxation during the period of the Rental Agreement with the JDA. The first PILOT payment scheduled for 2023 is for $1,500,000. Over 25 years Rivian would pay $300,000,000 in PILOT payments pursuant to the agreement. The EDA provides, however, that "[i]n the event that [Rivian] is required to pay any ad valorem taxes on any property interests in the Project, such amount of ad valorem taxes paid by [Rivian] shall be deducted from the PILOT Payments due from [Rivian]." The current annual ad valorem revenue for the undeveloped property at issue is $80,000.

*The Rental Agreement*

The JDA and Rivian also agreed to a Rental Agreement for the real and personal property involved with the Project.[2] Through the Rental Agreement, Rivian "agrees to acquire, construct, improve and install the Project, and to provide the Project to the State and to [the JDA] . . . [Rivian] agrees to expend on the Project an amount at least equal to the greater of $5,000,000,000 or the amount of the [b]onds issued for the development of the Project."

The Rental Agreement provides that the real property for the Project will be owned by the State, leased to the JDA, and then made available to Rivian. It further provides that the personal property involved in the Project will be owned by the JDA

---

[2] The Rental Agreement is not yet executed by the parties.

8

and made available to Rivian. The Rental Agreement states that it is the intention of the parties that the interest of Rivian under the agreement as to any real property included in the Project be that of a usufruct pursuant to OCGA § 44-7-1 (a) and that its interest in the personal property included in the Project to be a bailment for hire pursuant to OCGA § 44-6-101. The Rental Agreement explicitly disclaims any intention to create an estate for years. As discussed further below, the Rental Agreement provides various restrictions on the manner in which Rivian can use the property. The initial term of the Rental Agreement is through December 1, 2027, but it automatically extends for five year terms through December 1, 2047 unless explicitly terminated.

The Rental Agreement provides for Rivian to pay rent to the JDA accordingly:

On or before each date provided in the Bond Resolution for the payment of principal or interest on the [b]onds, until the principal of, and interest on the [b]onds shall have been paid in full, [Rivian] shall pay or cause to be paid to or as directed by the [JDA], as Basic Rent for the Project, a sum equal to the amount payable on such date as principal of and interest on the [b]onds . . . .

Rivian's obligation to make these rental payments is unconditional.

As to personal property, the Rental Agreement provides that

9

[i]n any instance where [Rivian] determines that any items of Equipment are not necessary at the facility or facilities that are the subject of this [Rental] Agreement, [Rivian] may remove such items of Equipment and transfer, sell, trade-in, exchange or otherwise dispose of them (as a whole or in part), and thereupon such removed Equipment shall no longer be subject to this [Rental] Agreement and shall not be considered a part of the Project. If requested by [Rivian], the [JDA] shall deliver a quitclaim bill of sale for such removed Equipment to [Rivian].

The respective Boards of Tax Assessors of Walton and Morgan Counties reviewed the proposed Rental Agreement between the JDA and Rivian and received legal counsel regarding it. Both boards determined Rivian's interest in the real and personal property under the Rental Agreement to be exempt from ad valorem taxation. They both also authorized and approved the payments to be made pursuant to the PILOT Agreement.

Pursuant to the Revenue Bond Law, OCGA §§ 36-82-60 through 36-82-85, in July 2022, the State filed a petition to validate the bonds and other aspects of the Project. Relevant to this appeal, the State sought a bond validation order declaring that the Bond Resolution and the agreements reached by the parties are confirmed and validated; "that the Rental Agreement will create in [Rivian] a usufruct in the real property comprising part of the Project and a bailment for hire as to the personal

10

property comprising part of the Project, which interests are not subject to ad valorem property taxes"; that none of the agreements create a tangible property interest of Rivian in the Project which would be subject to ad valorem property taxation; that the public notice of the bond validation was sufficient to exempt the JDA from compliance with performance audit review and period reports with respect to the expenditure of bond proceeds; and that the undertaking for which the bonds are issued and the security therefor are sound, feasible, and reasonable.

A public notice was filed concerning the petition to validate the bonds as well as related agreements. The notice specified in bold-face capital letters that no performance audit or performance reviews (as such terms are defined in OCGA § 36-82-100) would be performed.

Intervenors were permitted to intervene in the action without objection, and they filed an answer contesting the averments of the State in the petition and resisting validation of the bonds and other related agreements. See OCGA § 36-82-77 (a).

The superior court held an evidentiary hearing at which two witnesses testified: Jerry Silvio, the Chair of the JDA, and Andrew Capezzuto, the Chief Administrative Officer and General Counsel of the Georgia Department of Economic Development. The Intervenors cross-examined these witnesses, but did not call any witnesses of

11

their own. As will be discussed more fully below, these witnesses testified as to the contents of the agreements with Rivian as well as the anticipated benefits of the agreements. They were also cross-examined about cautionary representations made by Rivian in filings made to the Securities and Exchange Commission ("SEC") as well as the rate at which Rivian was spending the capital it raised.

Following the hearing, the superior court entered an order in which it refused to validate the bonds. Specifically, the superior court found that the Project and the bonds were not sound, feasible, and reasonable based on the superior court's concern with Rivian's ongoing financial stability, the scope of investigation performed by the JDA and the State into Rivian's stability, and the decision to waive audit requirements for the project (even though this waiver was authorized by statute). The superior court also found that the JDA failed to demonstrate that the Project would promote the general welfare of the local communities within its territory because there had been no analysis of the corresponding cost to the local communities in adjusting to the new development. Lastly, as is relevant to this case, the superior court found that the Rental Agreement creates a taxable estate for years and does not create a bailment for hire. The JDA and State timely appealed.

*Case No. A23A0574*

1. The JDA argues that the trial court erred by denying validation of the bonds because it improperly considered the Project's economic feasibility. Specifically, the JDA argues that the economic wisdom of the Project based on Rivian's financial status was beyond the scope of what the superior court could consider in deciding whether to validate the bonds. We agree that the superior court erred in denying validation of the bonds and the Project based on a finding that the JDA and the State did not make a prima facie case that the bonds were sound, feasible, and reasonable.

"In a bond validation hearing, the role of the trial court is to determine whether the bond proposal is sound, feasible, and reasonable."[3] (Citation and punctuation omitted.) *Berry v. City of East Point*, 277 Ga. App. 649, 650 (1) (627 SE2d 391) (2006). The superior court's "findings about soundness, feasibility, and reasonableness must be sustained on appeal if there is any evidence to support them." (Citation and punctuation omitted.) *Franzen v. Downtown Dev. Auth. of Atlanta*, 309 Ga. 411, 430 (3) (f) (845 SE2d 539) (2020). Admittedly, the specifics of this standard are not well-defined, but the law is clear that "the economic feasibility of the [bonds or the Project] is not required to be shown by the state in its petition." *Nations v.*

---

[3] It is worth noting that nothing in the statutory scheme for bond validation references "sound, feasible, and reasonable." This standard was created by the courts.

13

*Downtown Dev. Auth. of the City of Atlanta*, 255 Ga. 324, 330 (3) (a) (338 SE2d 240) (1985), citing *Rich v. State of Georgia*, 237 Ga. 291, 295 (2), n. 2 (227 SE2d 761) (1976). Moreover, our Supreme Court has recognized that the decision to issue bonds "is a legislative matter subject to the most limited review by the courts." *Rich*, 237 Ga. at 295 (2). The wisdom of this limited review is obvious – agencies tasked with promoting economic development are in a better position to assess the economic pros and cons of development deals than are the courts.

Our Supreme Court has held that

[i]f the petition of the [State] has alleged the facts required by the statute, and citizens are made parties for the purpose of contesting the validation of the bonds, necessarily they stand as quasi defendants. When they deny the substantial allegations of the petition of the [State], this places upon [the State] the burden of proving such allegations. In certain cases, where citizens who have become parties raise objections which do not appear in the pleadings between the [State] and the [development authority], but which depend for their support upon [evidence from another source], the burden of sustaining such allegation is upon the citizens alleging them. This may be analogized to the affirmative pleading of a defendant in an ordinary action at law. In ordinary lawsuits, an allegation by the plaintiff and a denial by the defendant puts the burden upon the plaintiff. If the defendant sets up an additional affirmative plea as to it the burden is upon him.

14

(Citation and punctuation omitted.) *Brown v. City of Atlanta*, 152 Ga. 283 (3) (109 SE 666) (1921); see also *Rich*, 237 Ga. at 295 (2) ("Since the burden is on the intervenor to come forward with evidence to support any affirmative defenses interposed by him against the petition by the state setting forth the validity of the bond issue, and the intervenor produced none, the trial court did not err in finding the program 'sound, reasonable, feasible and practical.'") (citations omitted).

Here, the superior court erred in finding that the State and the JDA did not make a prima facie case that the bonds and the Project are sound, feasible, and reasonable. Notably, the superior court did not find anything illegal about the structure of the bonds or the Project, and, in fact, rejected Intervenors' arguments attacking their legality. See *Reed v. State*, 265 Ga. 458, 459 (2) (458 SE2d 113) (1995) (affirming superior court's finding of feasibility where "the payments from the county under the intergovernmental contract represent a lawful source of revenue for the project" and finding that "[b]ecause the contractual payments are a lawful source of income, and the trial court had the contract before it, there was evidence to support the trial court's finding of feasibility [and the intervenor] . . . has shown no violation of the Georgia Revenue Bond Law."). Nor did the superior court find that the bonds or the Project were legally impossible. Compare *Hicks v. State*, 99 Ga. App. 302, 303

15

(3), 306-307 (108 SE2d 187) (1959) (reversing validation of bonds to be used to purchase a system that was not actually for sale). The superior court's decision was rooted in the economic feasibility of the bonds and the Project, which the State did not need to establish in its petition.

Before the superior court was evidence that shortly before the bond validation hearing, Rivian had over $21,000,000,000 in assets and $16,400,000,000 of cash on hand. The State and the JDA demonstrated that the bonds will be privately funded, will not be a debt of any government entity, and that they will not subject the State or any political subdivision to any pecuniary liability. They presented evidence of billions of dollars of economic investment from Rivian, millions of dollars of PILOT payments from Rivian, and a promise to create 7,500 new jobs with an average annual salary of $56,000. They further demonstrated that the State had committed to providing millions of dollars in subsidies to defray costs of the Project. Two witnesses, with extensive background in development deals, testified about the benefits to the local community which will come from this deal. Indeed, one witness called projects with manufacturers such as Rivian the "holy grail" of economic development projects due to the creation of new jobs, additional tax revenue, and likelihood of suppliers of the manufacturer locating nearby. This witness also testified

about indirect economic benefit to the community that comes as a result of increased construction jobs as well as the need for increased housing and retail as a result of such projects.

This was sufficient for the State to meet its burden to establish a prima facie case that the bonds and the Project are sound, feasible, and reasonable, which did not need to include a showing of economic feasibility. See *Nations*, 255 Ga. at 330 (3) (a). Indeed, although the superior court found that the State and the JDA did not establish a prima facie case, it did not make any factual findings which could support such a conclusion. For instance, the superior court did not find that the structure of the bonds was illegal or unconstitutional, it did not find that the bonds would subject taxpayers to liability, it did not find that the various agreements did not impose on Rivian the obligations claimed by the JDA and the State, and it did not question the reliability of the witnesses or find their testimony not credible.

To rebut this prima facie case, the Intervenors had the burden of introducing evidence that the bonds and the Project are not sound, feasible, and reasonable. Intervenors attempted to attack the economic feasibility of the bonds and the Project, but to do so all they did was introduce SEC filings containing cautionary language and demonstrate that Rivian has spent a lot of the capital it initially raised. The only

17

testimony concerning the impact of these documents on the soundness, feasibility, or reasonableness of the bonds or Project was testimony from the State's witnesses that the information in the SEC filings did not alarm them. The superior court was not presented with any conflicting evidence on which it could rely to find that the financial condition of Rivian rendered the project unfeasible. Instead, the superior court impermissibly speculated as to what Rivian's financial standing could mean for its ability to support the bonds and the Project. "Findings of fact based on mere conjecture can not be upheld because mere conjecture does not constitute evidence upon which findings may be based." (Citation and punctuation omitted.) *In re Sharee Baps Corp.*, 346 Ga. App. 434, 439 (816 SE2d 412) (2018). Accordingly, despite the deference owed to the superior court in these matters, here, there was no evidence to support the trial court's finding that the bonds and the Project are not sound, feasible, and reasonable due to economic infeasibility. The State and the JDA made a prima facie case which was not rebutted by the Intevenors.

It was concern about the economic feasibility of the bonds and the Project which caused the superior court to find it to be not sound, feasible, or reasonable for the Project to be exempted from public audits pursuant to OCGA § 36-82-100 (c), despite finding that the JDA "without question" complied with the requirements of

18

that statute. Generally, "[w]hen bonds are issued by a county, municipality, or local authority in the amount of $5 million or more, the expenditure of bond proceeds shall be subject to an ongoing performance audit or performance review[.]" OCGA § 36-82-100 (b). The issuer of the bonds, however, can waive such a requirement by "includ[ing] in a legal advertisement in bold print contained within requisite public notice soliciting public preapproval of the applicable bond issue [language] which expressly states that no performance audit or performance review shall be conducted with respect to such bond issue." OCGA § 36-82-100 (d).

It is without dispute that the JDA complied with this procedure provided to it by the General Assembly, and neither the Intervenors nor the trial court have pointed to any legal authority to permit this to be a basis for refusing to validate a bond. Indeed, the Intervenors did not argue to the superior court that this was a basis upon which the bond validation should be denied. Accordingly, the superior court erred in relying on this as a basis to find that the bonds were not sound, feasible, and reasonable.

2. Next, the JDA contends that the trial court erred by denying bond validation based on its concerns that it failed to establish a prima facie case that the Project will promote the general welfare of the local communities in its territory. Again, we agree.

19

In permitting the creation of development authorities, the Georgia Constitution recognizes that "[t]he development of trade, commerce, industry, and employment opportunities [is] a public purpose vital to the welfare of the people of this state[.]" Ga. Const. Art. IX, Sec. 6, Par. III. Indeed, the General Assembly provided that

> [t]he purposes of this chapter [concerning development authorities] are to develop and promote trade, commerce, industry, and employment opportunities for the public good and the general welfare and to promote the general welfare of the state. No bonds or bond anticipation notes, except refunding bonds, shall be issued by an authority under this chapter unless its board of directors adopts a resolution finding that the project for which such bonds or notes are to be issued will promote the foregoing objectives and will increase or maintain employment in the territorial area of such authority.

OCGA § 36-62-9. After the JDA made such a finding, the State filed its petition to validate the bonds and the Project in which the State specifically requested a finding that the Project will "develop and promote trade, commerce, industry, and employment opportunities for the public good and general welfare within the territory of the [JDA]." In light of this request, as discussed above, the State was required to establish a prima facie case, which it did for the reasons discussed in Division 1.

20

The Intervenors then had the burden to demonstrate that the bonds and the Project would not, in fact, benefit the community. The Intervenors attempted to do so by cross-examining the witnesses at the hearing concerning the lack of studies or evidence regarding the cost the community would bear in supporting the Project, such as infrastructure costs. Importantly, however, the Intervenors introduced no evidence concerning the cost to the local community to support the Project, let alone evidence demonstrating that the cost would exceed the benefit from the economic development or that the State's grant would not adequately offset the costs to the community. Our Supreme Court has recognized that appellate courts should defer to the findings of local development authorities that a "project will provide public benefits, particularly where those findings do not appear unreasonable and [Intervenors] have presented no actual evidence to the contrary." *Savage*, 297 Ga. at 637 (4) (c); see also *Smith v. Bd. of Commissioners of Roads & Revenues of Hall County*, 244 Ga. 133, 141 (3) (259 SE2d 74) (1979) ("Whether the contract now in question is one which will benefit the taxpayers and residents of the Hall County Fire District is a question properly for determination in the first instance by the County Commission and finally by actual experience. We are bound by the appellate decisions holding that unless there is an abuse of discretion superior courts should not substitute their judgment or interfere

with governing authorities in the [p]roper exercise of their judgment concerning such matters.").

Here, the Intervenors did not meet their burden to overcome the showing made by the State. Accordingly, the superior court erred in refusing to validate the bonds and the Project on this basis.[4]

_____

[4] This case is distinguishable from *Greene County Dev. Auth. v. State*, 296 Ga. 725 (770 SE2d 595) (2015). In that case, our Supreme Court affirmed the superior court's finding that the project at issue, providing financing to a public charter school, was not sound, feasible, and reasonable; however, there, unlike here, it appears that the development authority did not meet its initial burden of demonstrating that the project would promote the economic development of the county. Id. at 727 ("To begin, we note that the purpose of the proposal was to promote economic development in Greene County, and there was testimony from an expert witness that, generally speaking, improving the quality of education in a community will improve the prospects for economic development, a proposition that the trial court acknowledged as an indisputable one. The expert offered only scant and conclusory testimony, however, about the *particular* impact upon economic development that construction of the proposed facility for the use of the Academy might be expected to have. The superior court was entitled to assess the credibility of the expert on this point and to give his opinion testimony as much or as little weight as the superior court deemed appropriate. Although the trial court did not speak in detail about the credibility and weight of this testimony, the trial court did express at the hearing a concern about the extent to which the Authority's proposal would, in fact, benefit the citizens of Greene County.") (emphasis in original; citation omitted). Indeed, the Supreme Court stated that "the evidence about the economic benefit of the proposal was not overwhelming," id., which is in stark contrast to the extensive evidence provided here about the way in which the Project will promote the general welfare of the community.

3. The JDA contends that the superior court erred in finding that the Rental Agreement does not create a bailment for hire. We disagree.

"As applied to personalty, an estate for years differs from a contract of hiring, which is a bailment conveying no interest in the property to the bailee but *merely the right of use*." (Emphasis supplied.) OCGA § 44-6-101. "A bailment is a delivery of goods or property upon a contract, express or implied, to carry out the execution of a special object beneficial either to the bailor or bailee or both and to dispose of the property in conformity with the purpose of the trust." OCGA § 44-12-40. "[A] bailment relationship is created when one party is involved in an undertaking for a consideration to safeguard the personal property of another and exercises complete dominion at all times over the property."[5] *Park 'N Go of Georgia, Inc. v. U.S. Fid. & Guar. Co.*, 266 Ga. 787, 790 (471 SE2d 500) (1996).

---

[5] The superior court's analysis on this issue was both exceptionally brief and also misguided. The superior court conflated its analysis of whether Rivian had a usufruct in the real property with whether Rivian's interest in the equipment was a bailment. The superior court also premised its finding that Rivian's interest was not a bailment on the fact that Rivian had control over the equipment; however, exercising dominion over property is consistent with a bailment. Nonetheless, we can affirm the superior court as right for any reason. See *City of Gainesville v. Dodd*, 275 Ga. 834, 835 (573 SE2d 369) (2002) ("Under the 'right for any reason' rule, an appellate court will affirm a judgment if it is correct for any reason, even if that reason is different than the reason upon which the trial court relied.").

Here, the Rental Agreement provides that "title to all additions, modifications or improvements constituting Equipment which are a part of the Project and are paid for with proceeds of the [b]onds shall be in the [JDA] and shall be subject to [the Rental] Agreement." It further provides "[i]t is the intention of the parties that the interest of [Rivian] hereunder shall be . . . a bailment for hire under OCGA § 44-6-101, as to the personal property of the Project[.]]" Despite stating this intent, the Rental Agreement grants Rivian an interest in the equipment beyond mere use; it provides Rivian rights in the equipment of the Project which are inconsistent with a lack of ownership and it deprives the JDA of rights which are consistent with ownership. Specifically, the Rental Agreement provides:

> *Removal of Equipment.* The [JDA] shall not be under any obligation to renew, repair or replace any inadequate, obsolete, worn-out, unsuitable, undesirable or unnecessary Equipment. In any instance where [Rivian] determines that any items of the Equipment are not necessary at the facility or facilities that are the subject of this [Rental] Agreement, *[Rivian] may remove such items of Equipment and transfer, sell, trade-in, exchange, or otherwise dispose of them* (as a whole or in part), and thereupon such removed Equipment shall no longer be subject to this [Rental] Agreement and shall not be considered part of the Project. *If requested by [Rivian], the [JDA] shall deliver a quitclaim bill of sale for such removed Equipment to [Rivian]. . . .*

24

[Rivian] from time to time shall cause to be redeemed an amount of the [b]onds corresponding to the book value of Equipment removed and not replaced (rounded to the nearest $5,000) pursuant to the provisions [of this section], but [Rivian] shall not be required to do so for so long as the aggregate book value with respect to which corresponding redemptions have not been made does not exceed $15,000,000.

[Rivian] will promptly report from time to time such removal, substitution, sale and other disposition; provided that no such report need be made until the amount on account of all such sales, trade-ins or other dispositions not previously reported aggregates at least $15,000,000. (Emphasis supplied.)

Put another way, the Rental Agreement permits Rivian, at its own discretion, to dispose of equipment which is owned by the JDA, with or without title being first transferred to Rivian, and does not require Rivian to even report such activity to the JDA until it has disposed of $15,000,000 worth of equipment. Pretermitting whether Rivian is ever contractually required to compensate the JDA when Rivian disposes of property belonging to the JDA, this language makes clear that Rivian has no obligation to compensate the JDA so long as the cumulative book value of any equipment which is removed and not replaced is less than $15,000,000. Such an arrangement, in which a bailee keeps all monies following the disposition of its

bailor's property, is fundamentally inconsistent with a bailment, as it demonstrates an interest beyond mere use of the property. Compare *Furst Bros. v. Com. Bank of Augusta*, 117 Ga. 472 (43 SE 728) (1903) (finding that grocery store was a bailee of whiskey which the store was to sell and then for which the provider of the whiskey was to be paid).

Moreover, Rivian does not just have complete dominion over the use of equipment during the time the equipment is in its possession, which is permissible in a bailment; but it has complete dominion over title to the equipment. In addition to having total control over the disposition of the equipment, Rivian can demand that the JDA quit claim its title to Rivian, a demand that the Rental Agreement does not permit the JDA to refuse.[6] This permits a situation where the bailee, Rivian, could act in a way which fails to acknowledge the bailor, the JDA's, superior interest in the equipment. This is impermissible in a bailment relationship. See *Farkas v. Farkas*,

---

[6] The language in this portion of the Rental Agreement stands in contrast to the immediately proceeding portion of the agreement regarding the real property at the Project site. In that provision, the Rental Agreement provides that "[Rivian] may, at [Rivian's] own cost and expense, *and with the consent of the [JDA]*, demolish and replace all or any portion of the Buildings with new buildings and improvements, which consent shall not be unreasonably withheld, conditioned or delayed, so long as the same constitute vehicle manufacturing and research, development, testing, sales and/or service facilities . . ." (Emphasis supplied.) If this language was included in the bailment provision, there would be a different analysis.

235 Ga. App. 491 (510 SE2d 58) (1998) ("[T]he rule is well settled that a bailee can not dispute or deny the title of his bailor. By the acceptance of the bailment the bailee impliedly admits the title of [its] bailor, and [it] is estopped thereafter from disputing it.") (citation and punctuation omitted).

Rivian's interest in the equipment transcends mere use of the property,[7] and thus, the trial court was correct to find that the Rental Agreement did not create a bailment.[8] This does not impact our holding in Divisions 1 and 2 that the superior court erred in refusing to validate the bonds on the grounds it did.

4. The JDA contends that the trial court erred in determining that the Rental Agreement gave Rivian an estate for years rather than a usufruct. Finding error, we agree.

---

[7] With regard to the issue of bailment, the JDA and the State have not argued that we should owe any deference to the determination by the relevant taxing authorities that Rivian's interest in the equipment is a bailment. We thus do not address this issue.

[8] We recognize that "the parties are free to contract and may by express agreement enlarge, abridge, qualify, or supersede obligations that otherwise would arise from the bailment by implication of law – so long as the contract does not violate statutory law or contravene public policy – and, so long as such restrictions are expressed in clear and unambiguous language." (Citation omitted.) *Thorpe v. Sterling Equip. Co.*, 315 Ga. App. 909, 914 (2) (b) (729 SE2d 52) (2012). Here, however, the contractual enlargement of Rivian's interest in the equipment is so great that the interest is inconsistent with a bailment.

27

A usufruct creates a lesser interest in real estate than does an estate for years, and is not subject to ad valorem taxation. *Chatham County Bd. of Assessors v. Jay Lalaji, Inc., Airport Hotels*, 357 Ga. App. 34, 35 (849 SE2d 768) (2020).

> A usufruct is created when the owner of real estate grants to another person the right simply to possess and enjoy the use of such real estate either for a fixed time or at the will of the grantor. In such a case, no estate passes out of the landlord and the usufruct may not be conveyed except by the landlord's consent, nor is it subject to levy and sale. A usufruct has been referred to as merely a license in real property, which is defined as authority to do a particular act or series of acts on the land of another without possessing any estate or interest therein. By way of contrast, an estate for years, which does not involve a landlord-tenant relationship, carries with it the right to use the property in as absolute a manner as may be done with a greater estate and is subject to ad valorem taxation.

(Citation omitted.) Id. "A lease of real estate for a period of less than five years is presumed to be a non-taxable usufruct, and there is a rebuttable presumption that a lease for five years or more is a taxable estate for years." (Citation and punctuation omitted.) *Macon-Bibb County Bd. of Tax Assessors v. Atlantic Southeast Airlines, Inc.*, 262 Ga. 119 (414 SE2d 635) (1992); OCGA § 44-7-1 (b).

The lease in the instant case is structured in five-year increments, with automatic extensions until 2047. Although this creates a rebuttable presumption of an estate for years, the agreement itself specifically provides that it:

> *does not grant and shall not be construed as a grant of title or a leasehold estate* . . . [t]he [JDA] is not granting to [Rivian] hereunder all of the [JDA]'s estate in the Land and Buildings leased to it under the State Lease. It is the intention of the parties that the interest of [Rivian] hereunder *shall be a usufruct* under OCGA § 44-7-1 (a) as to any real property included in the Project[.]

(Emphasis supplied.) "Whether an estate in the land passes to the tenant, or he merely obtains a usufruct[,] depends upon the intention of the parties; and this is true without regard to the length of the term." (Citation and punctuation omitted.) *Atlantic Southeast Airlines, Inc.*, 262 Ga. at 119.

The question before us is whether the presumption is rebutted by the intention of the parties as reflected in the terms of the Rental Agreement. "Not unexpectedly, there are numerous cases involving leases which have some provisions characteristic of the conveyance of an estate for years along with others indicative of the grant of a mere usufruct." *Jekyll Dev. Assocs. v. Glynn County Bd. of Tax Assessors*, 240 Ga. App. 273, 274 (2) (523 SE2d 370) (1999). "Therefore, the provisions of the lease

29

must be scrutinized objectively to determine whether the legal effect of the agreement between [the parties] is to give [Rivian] a usufruct or an estate for years." *Allright Parking of Ga. v. Joint City-County Bd. of Tax Assessors*, 244 Ga. 378, 386 (3) (260 SE2d 315) (1979); accord *Atlantic Southeast Airlines*, 262 Ga. at 120.

> Factors to be considered in determining whether the parties intended to create a usufruct include: (i) the terms used in the instrument of conveyance to describe the grantee's rights; (ii) any provisions in the instrument addressing the parties' understanding as to liability for ad valorem taxes; (iii) the grantor's retention of dominion or control over the leased property; (iv) which party has retained the duties to keep and maintain the premises and appurtenances; and (v) whether the grantee may assign the lease or allow any part of the leased premises to be used by others without the grantor's consent.

(Citations and punctuation omitted.) *City of College Park v. Paradies-Atlanta, LLC*, 346 Ga. App. 63, 66 (2) (815 SE2d 246) (2018).

(a) First, we look to the terms of the Rental Agreement. The agreement establishes a limited set of rights in Rivian and an implicit or explicit retention of other rights in the JDA. As noted above, the agreement specifically provides that it grants only a usufruct, and further provides that its terms "limit [Rivian's] rights in the Project to such an extent that [Rivian] does not have the right to use the Project

30

in as absolute a manner as it would have if it were the owner of the Project or a lessee with an estate for years . . ." The Rental Agreement also provides that it "does not grant and shall not be construed as a grant of title or leasehold estate" to Rivian. "These express terms are not dispositive, however, since the key inquiry turns upon whether the various restrictions in the agreement, limiting the lessee's use of the premises, sufficiently negate the presumption that it is an estate for years." (Citation and punctuation omitted.) *Clayton County Bd. of Tax Assessors v. Aldeasa Atlanta Joint Venture*, 304 Ga. 15, 16 (1) (815 SE2d 870) (2018).

(b) Turning to the second factor in the *Paradies-Atlanta* test, the liability for ad valorem taxes, the Rental Agreement clearly provides that "the interest in the Projected created hereby in [Rivian], under current Georgia law, is a mere usufruct . . ., which is not a taxable interest for purposes of *ad valorem* taxation." Noting that the JDA cannot guarantee "any particular *ad valorem* tax treatment resulting from this Agreement[,]" however, the Rental Agreement also provides that if ad valorem taxes are legally levied, the JDA will support Rivian in contesting them and, although Rivian must pay the taxes, if it is required to do so, it "will receive a credit against its obligations to make PILOT Payments to the extent of such *ad valorem* taxes paid." These provisions indicate a usufruct. See *Atlantic Southeast Airlines,* 262 Ga. at 121

31

(finding a usufruct where, inter alia, lessee's "required monthly 'service payment[]'
. . . could be intended to provide the City [which was the lessor] with a replacement
for tax revenue that the City would receive were [the lessee's] interest in the property
taxable"). Even where a lease specifically provides that the lessee pay ad valorem
taxes – without providing any financial offset – we have determined that such a
clause "is not dispositive of an intent to create an estate for years." *Jay Lalaji, Inc.*,
357 Ga. App. at 37; accord *Clayton County Bd. of Tax Assessors v. City of Atlanta*,
164 Ga. App. 864, 865-866 (1) (298 SE2d 544) (1982) (usufruct created despite lease
provision requiring lessee to be liable for taxes and assessments levied on property),
superseded by statute on other grounds as recognized in *Aldeasa Atlanta Joint
Venture*, 304 Ga. at 19-20 (2) (b).

(c) Turning to the issue of which entity has dominion or control over the
property, the Rental Agreement's terms contain indicia both of an estate for years and
a usufruct.

The Rental Agreement requires that Rivian "acquire, *construct, improve and
install the Project*, and to provide the Project to the State and to [the JDA]" and it
provides that Rivian may "make additions, modifications, or improvements,"
including constructing additional buildings. The lease, however, restricts such

32

alterations to those that "do not materially change the use of the Project" from its contractually intended purpose as a facility for vehicle manufacturing and related services. While Rivian must provide the JDA with copies of the plans, the lease does not mention prior approval, requiring Rivian to give the JDA notice only if projected construction costs exceed $15,000,000. The lease provides that such alterations or additional buildings are at Rivian's "own expense," with the State holding title to all alterations that constitute "[b]uildings" paid for with bond proceeds. If Rivian wishes to "demolish and replace all or any portion of the [b]uildings," it must obtain the JDA's consent, which "shall not be unreasonably withheld[.]" Such demolition or replacement neither reduces nor increases Rivian's rent liability and all replacement buildings and structures "shall be the property of the State[.]". Pertinently, the Rental Agreement provides that the JDA's "only obligation with respect to payment of [c]osts of the Project shall be to make available to [Rivian] the proceeds of the the [b]onds."

While the ability to engage in construction and alterations costing less than $15,000,000 without consent from the JDA on its face indicates an estate for years, the terms, overall, indicate a usufruct. First, although Rivian must pay for buildings and improvements, the State holds full ownership of the buildings and restricts how

33

Rivian can use the property, which is inconsistent with an estate for years. Second, the Rental Agreement specifically requires Rivian to comply with Section 2.5 of the the EDA. Section 2.5 provides that because of its "ultimate ownership by the State and by virtue of its being an economic development project providing public benefits . . . the Project Site will be exempt from local zoning ordinances." The EDA, however, requires that notwithstanding the exemption, Rivian must comply with certain specified zoning and environmental provisions, including limitations on the amount of impervious surface at the site, stormwater detention structures, road setbacks, and tree protection ordinances. The EDA also restricts Rivian's use of billboards and signage. Such restrictions, "though reasonable and appropriate under the circumstances, nevertheless are incompatible with an estate for years as defined by Georgia law." *Camp v. Delta Air Lines, Inc*., 232 Ga. 37, 40 (205 SE2d 194) (1974); see *Eastern Air Lines, Inc. v. Joint City-County Bd. of Tax Assessors*, 253 Ga. 18, 19 (3) (315 SE2d 890) (1984) (holding that restrictions on lessee's use of signs or advertising indicates a usufruct); *Richmond County Bd. of Tax Assessors v. Richmond Bonded Warehouse Corp*., 173 Ga. App. 278, 279 (325 SE2d 891) (1985) (finding requirement that lessee's use of premises conform to laws and regulations

34

of relevant government bodies "indicates the high degree of control retained by" lessor).

The Rental Agreement also contains other restrictions which indicate a usufruct. It provides that Rivian may use the Project "only for the limited purpose of developing and operating vehicle manufacturing and research, development, testing, sales and/or service facilities, including potential battery manufacturing facilities, and related facilities[,]" and "for other limited purposes . . . approved by the [JDA] in writing."

The Intervenors analogize these restrictions to those in *GeorgiaCarry.Org., Inc. v. Atlanta Botanical Garden, Inc.*, 362 Ga. App. 413 (868 SE2d 802) (2022), pointing out that this Court found an estate for years even where the lease required that the property, inter alia, be used as a botanical garden in accordance with the City of Atlanta's "Master Plan," the City retained the right to disapprove of future developments, and the lease required the Garden to do specified types of maintenance involving roads, parking areas, plants, and green spaces, finding that the restrictions were not "extremely burdensome" and did not "restrict[] the Garden's use and enjoyment of the property as a botanical garden . . ." Id. at 418-419 (2). The Intervenors overlook a crucial part of the analysis in *Atlanta Botanical Garden*,

however, where this Court additionally and explicitly based its analysis of the restrictions on the context that "the lease between the City and the Garden granted a 'leasehold estate' to the Garden[,]" id. at 419-420 (2), and the fact that the lease granted the Garden "exclusive control, possession, and enjoyment" *and* "exclusive control and management[.]" Id. at 417 (1), 418 (2). By contrast, the lease in the instant case states that "the [JDA] may control use of the Project[,]" and explicitly grants a usufruct. While it is true that the parties' statements of intent to grant a usufruct are not dispositive, neither can they be ignored. Again, as our Courts have held, contractual usage restrictions such as those at issue here," though reasonable and appropriate under the circumstances," nevertheless may be incompatible with an estate for years when combined with other restrictions. See *Camp*, 232 Ga. at 40 (finding that lease provisions restricting Delta's use of property were "reasonable for space leased in the airport terminal to an airline" and indicated a usufruct when combined with other indicia of lessor control).

The Rental Agreement also requires Rivian to comply with health, environmental, safety, and anti-discrimination laws. Although the Intervenors argue that Rivian must comply with applicable law regardless, the Rental Agreement gives the JDA the "right to enforce such covenants[,]" indicating it retains high degree of

36

control. Such terms indicate a usufruct. See *Atlantic Southeast Airlines*, 262 Ga. at 120-121 (holding that presumption of estate for years rebutted where airline leasing property could use it for "any lawful purpose . . . not in conflict with the normal operations of the [a]irport[;]" and lease required airline to comply with various laws to preserve tax-exempt status, as these provisions "indicate a high degree of control" by lessor) (citations and punctuation omitted).

The JDA also retains the right to inspect the Project, with 48 hours' notice to Rivian. This retention of control is consistent with a usufruct. See *Dekalb County Bd. of Tax Assessors v. W. C. Harris & Co.*, 248 Ga. 277, 280 (2) (282 SE2d 880) (1981); accord *Paradies-Atlanta*, 346 Ga. App. at 68 (2).[9] Here, most sections of the lease

---

[9] The Intervenors argue that the Rental Agreement's grant of a covenant of quiet enjoyment indicates an estate for years. They cite *Atlanta Botanical Garden*, 362 Ga. App. at 419 (2), which finds that, where the contract explicitly granted the Garden a "leasehold estate," the covenant of "exclusive 'enjoyment'" in a quiet enjoyment clause, combined with other indicia, established an estate for years. They also cite to the case on which *Atlanta Botanical Garden* ultimately relies for this point, *Jekyll Dev. Assocs.*, 240 Ga. App. at 277 (5), in which this Court, where the lease explicitly granted an "estate for years" and a "leasehold estate," mentioned a covenant of quiet enjoyment as a counterpoint to a lease provision indicating a usufruct, but provided no analysis. It is important to recognize what a covenant of quiet enjoyment actually is. A covenant of quiet enjoyment does not apply to contractual restrictions, or lack thereof, on a *lessee's* use of the property. Rather, a covenant of quiet enjoyment "is necessarily implied in *every lease* and goes to the extent of representing that the *landlord has a good title* and can give *a free and unencumbered lease* of the premises for the term stipulated." (Citation and

37

either grant rights, or impose restrictions and obligations on the lessee consistent with a usufruct.

(d) Next we examine the lease to discern which party has retained the duties to keep and maintain the premises and appurtenances. The Rental Agreement provides that Rivian, "by operation of express covenant and not by operation of law" must maintain, repair, and insure the Project, and keep conditions safe, and that the JDA has no obligation in this regard.

"If the parties had intended to convey an estate for years, the duties described would have been the lessee's responsibility under the law, thus making it unnecessary to insert such a provision in the body of the agreement." *Richmond Bonded Warehouse Corp.*, 173 Ga. App. at 279 (finding a usufruct where parties' agreement stated that "lessee shall at its sole cost, keep and maintain said premises and appurtenances and every part thereof, normal wear and tear excepted only").

The Rental Agreement also requires Rivian to spend the greater of $5,000,000,000, or amount of the bonds issued, developing the Project, which

punctuation omitted; emphasis in original and supplied.) *George v. Hercules Real Estate Svcs., Inc*., 339 Ga. App. 843, 850 (2) (a) (i) (795 SE2d 81) (2016). We need not address the continuing viability of *Atlanta Botanical Garden* and *Jekyll Dev. Assocs.* in regards to quiet enjoyment, however, because in the instant case, the balance of relevant indicia weighs most heavily on the side of a usufruct.

38

includes the obligation to "improve" it, yet the State has title to buildings, improvements and fixtures. Where a lease "obligate[s] the lessee to expend certain minimum sums in making repairs and improvements[,] . . . [r]estrictions such as these are consistent with the grant of a usufruct." *Jekyll Dev. Assocs.*, 240 Ga. App. at 276 (5).

Similarly, the lease requires Rivian to maintain insurance "for casualty and extended loss[.]" While it is true that a requirement that the lessee "provide broad insurance coverage for the premises and facilities . . . [is] generally the responsibility of the holder of an estate in the property[,]" *Jekyll Dev. Assocs.*, 240 Ga. App. at 275 (3), here, the JDA retains control in that the lease requires Rivian to name the JDA "as an additional insured," to provide the JDA with insurance certificates, mandates that Rivian cannot terminate the insurance without giving the JDA notice, and establishes repayment obligations, with interest, if Rivian lets the insurance lapse and the JDA must then provide it. Rivian's lack of control distinguishes this case from the point raised in *Jekyll Dev. Assocs*. See *Warehouses, Inc. v. Wetherbee*, 203 Ga. 483, 489 (46 SE2d 894) (1948) (finding that because payment of insurance is "imposed by law upon the landlord[,]" it would be necessary to provide in a lease intended as a usufruct that the tenant was responsible).

39

(e) Finally, we examine Rivian's ability to sublet or assign its rights. The JDA grants Rivian "sole and exclusive possession, occupancy] and use of each component of the Project[,]" but does not allow Rivian to create a lien or encumbrance on the Project, to convey any rights, interests, or duties in the Rental Agreement, or to sublet the Project, except to an affiliate, unless it first obtains the JDA's consent. As to the latter, even if the JDA approves subleasing, the Project still is restricted to use as a facility for vehicle manufacturing-related activities. While the ability to encumber the property implies that the "lessee has an interest in the property transcending that of a mere right of use[,]" the Rental Agreement also contains the requirement that "the lessor approves[; s]uch restrictions are generally inconsistent with the concept of fee simple ownership." *Jekyll Dev. Assocs*., 240 Ga. App. at 276 (5). The Rental Agreement provides that the JDA cannot unreasonably withhold consent to subletting, but this circumscription of the JDA's power is limited to Rivian's "suppliers" and this provision contains no other limits on the JDA's authority to deny other subletting requests. See *Atlanta Southeast Airlines*, 262 Ga. at 120, n. 2 (affirming existence of a usufruct even where lease provided that lessors could not "unreasonably, capriciously or arbitrarily withhold their consent" to assignments and subleases); compare *Jekyll Dev. Assocs*., 240 Ga. App. at 276 (5) (holding that April

40

17, 2023 lease provision requiring landlord's permission to sublet indicates a usufruct, but lease providing that consent cannot be unreasonably withheld circumscribes landlord's power). Here, because the JDA's subletting power is circumscribed by "reasonableness" only as to Rivian's suppliers – and is not limited as to other unaffiliated tenants – Rivian's "subletting and assignment rights are restricted in a manner inconsistent with an estate for years which normally can be alienated without the grantor's consent." (Citation and punctuation omitted.) *Eastern Air Lines*, 253 Ga. at 19 (3).

(f) The JDA argues that the trial court erred in failing to defer to the findings of the Morgan and Walton County Boards of Assessors, which determined that the project was a usufruct. Because we have determined that the project is a usufruct, we need not reach this contention of error.

*Case No. A23A0596*

5. The arguments raised by the State in this appeal are identical to the ones raised by the JDA in Case No. A23A0574. For the reasons identified in Divisions 1-2

41

and 4 above, we reverse the superior court; as discussed in Division 3, we affirm the trial court's finding regarding Rivian's interest in the equipment at the Project.[10]

*Judgments affirmed in part and reversed in part. Barnes, P. J. concurs in the judgment only, and McFadden, P. J., concurs in part and dissents in part.*

---

[10] The Intervenors argue that the State lacks standing to participate in this appeal because it did not present evidence at the hearing in this case, instead deferring to the JDA to present evidence. We are unpersuaded. The law provides that,

> the district attorney or the Attorney General shall prepare and file, in the office of the clerk of the superior court of the county issuing the bonds or of the county in which the governmental body is located, a petition directed to the superior court of such county *in the name of the state* and against the governmental body desiring to issue the revenue bonds.

(Emphasis supplied.) OCGA § 36-82-75. Indeed, the State is the party which requested, through its petition, for the bonds and the Project to be delegated. A party to a civil case has standing to bring an appeal. See *Barham v. City of Atlanta*, 292 Ga. 375, 376 (1) (738 SE2d 52) (2013).

A23A0574. JOINT DEVELOPMENT AUTHORITY OF JASPER

COUNTY, MORGAN COUNTY, NEWTON COUNTY AND

WALTON COUNTY v. McKENZIE et al.

A23A0596. STATE OF GEORGIA v. McKENZIE et al.

MCFADDEN, Presiding Judge, concurring in part and dissenting in part.

I concur in the majority opinion, except Division 3, in which the majority affirms the superior court's holding that the rental agreement does not create a bailment for hire. I would hold that the agreement does create such a bailment and that the superior court's finding to the contrary was erroneous. So I dissent from Division 3.

The express intent of the parties was to create a bailment. Creating a bailment was essential to their overall undertaking. A major element of that undertaking was to provide tax incentives in exchange for Rivian's commitment to make a Five Billion Dollar investment in Georgia.

Those tax incentives are to be created by allowing Rivian beneficial use of real and personal property while reposing title to those assets in the tax-exempt joint development authority (JDA). As to real property, those incentives and that

arraignment are accomplished by way of a usufructuary interest. As to personal property, they are accomplished by way of bailment.

The majority would upend that arrangement as it relates to personal property on the basis of a flaw it perceives in the provisions for disposal of "inadequate, obsolete, worn-out, unsuitable, undesirable or unnecessary Equipment." The majority finds this flaw on the basis of a supposed prerequisite to bailment which is unsupported by Georgia law or the law of any other jurisdiction of which we are aware, which is contrary to Georgia's statutory definition of bailment, and which would impose a standard that is subjective and therefore destabilizing.

Specifically, the majority finds fault with a provisions under which the development authority has authorized to Rivian to determine when equipment is no longer useful, has agreed to sign over title in order to facilitate the sale of such no-longer-useful equipment, and under which Rivian is to account for such proceeds at Fifteen Million Dollar intervals.

Under this provision, according to the majority, "so long as the cumulative book value of any equipment which is removed and not replaced is less than $15,000,000 . . . [the] bailee keeps all monies following the disposition of its

bailor's property[.]" This, the majority holds, is "fundamentally inconsistent with a bailment, as it demonstrates an interest beyond mere use of the property." I disagree.

As support for that holding the majority cites *Furst Bros. v. Commercial Bank of Augusta*, 117 Ga. 472 (43 SE 728) (1903). But that case sheds little light on this one. It is a fact-intensive analysis of whether a transaction that the parties called a "consignment" was "a sale or a bailment." Id. at 474-476 Bailment arises in a wide variety of circumstances. The circumstances in *Furst* were very different from those before use today. So *Furst* has little to tell us about whether the provisions before us are or are not consistent with bailment.

Fifteen Million Dollars is, of course, a lot of money. It is also three tenths of one percent of Rivian's Five Billion Dollar commitment. Disposal of no-longer-useful property was not among the parties' central concerns. To require them to renegotiate on the basis of a perceived flaw in the provisions for such disposal is to thrash about a very large dog by a very small tail.

Particularly in light of the scale of the project, we should not second-guess the parties' decision to provide for such accounting at intervals of Fifteen Million Dollars. The parties were in a position to determine what interval is most appropriate. We are not.

I doubt that the contract allows Rivian to simply keep disposal proceeds under that amount. As noted, we must defer to the parties' determination that Fifteen Million Dollar intervals are appropriate under the circumstances. I do agree that the contract does not provide as clearly as it might for an eventual windup of the business. So I suppose it is conceivable that Rivian might at that point lay claim to the remaining disposal proceeds. But we should not dream up and then resolve imagined future contract-construction disputes in order to invalidate the parties' agreement.

And even if the agreement does entitle to Rivian to such remaining proceeds, that is no reason to hold that the parties have failed to create a bailment. Bailees can be compensated. See *Park 'N Go of Georgia. v. U.S. Fidelity & Guar. Co.*, 266 Ga. 787, 790 (471 SE2d 500) (1996) ("a bailment relationship is created when one party is involved in an undertaking *for a consideration to safeguard* the personal property of another and exercises complete dominion at all times over the property") (emphasis added). Creation of a bailment is not conditioned on judicial approval of the amount of such compensation or the method of payment.

The majority also objects that "Rivian ha[s] total control over the disposition of the equipment [and that] Rivian can demand that the JDA quit claim its title to

Rivian, a demand that the Rental Agreement does not permit the JDA to refuse." The majority describes the provision for disposal of no-longer-useful equipment as giving Rivian "complete dominion over title to the equipment" Relying on authority for the long-settled rule that a bailee cannot question the bailor's title, see *Farkas v. Farkas*, 235 Ga. App. 491, 492 (510 SE2d 58) (1998), the majority holds, "This is impermissible in a bailment relationship." Again, I disagree.

The parties did exactly what the applicable statute authorizes. It authorizes parties to contract for "dispos[al] of the property in conformity with the purpose of the trust." OCGA § 44-12-40. The parties have agreed that no-longer-useful property is to be sold and that Rivian should be charged with identifying and selling it. We may not second guess that business decision. Moreover, Rivian's exercise of that discretion will be governed by the duty of good faith and fair dealing. See *Hunting Aircraft v. Peachtree City Airport Auth*., 281 Ga. App. 450, 451-452 (1) (636 SE2d 139) (2006).

The majority's holding is not just wrong. It is destabilizing. The majority holds that, notwithstanding the parties' stated intent to create a bailment and reliance on the tax consequences of a bailment, they failed to create a bailment because the bailee's possessory interest crossed a line beyond which possession becomes title and a

5

bailment is not created. Outside the context of the facts before us, this opinion does not tell us where that line is. That will create difficulties, especially for parties drafting future development agreements.